**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juan Paul ROBERTSON,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Juan Paul ROBERTSON,
Defendant–Appellee.**

**Nos. 92–50395, 92–50460.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1993.

Decided Feb. 1, 1994.

Glenn Stewart Warren, San Diego, CA, for the defendant-appellant, cross-appellee.

Steven W. Peterson, Assistant United States Attorney, San Diego, CA, for the plaintiff-appellee, cross-appellant.

Before REINHARDT, T.G. NELSON, Circuit Judges, and KAUFMAN,* District Judge.

T.G. NELSON, Circuit Judge:

## I

### OVERVIEW

Juan Paul Robertson (Robertson) appeals his jury convictions for conspiracy and possession of cocaine with intent to distribute (Counts One through Four) and RICO (Count Six). Because we conclude that the Government failed to prove that the enterprise affected interstate commerce, we reverse the RICO count. We affirm the remaining Counts One through Four, but vacate the sentences with regard to those counts and remand for resentencing.

## II

### FACTS AND PROCEDURAL HISTORY

After working for several years as a lawyer for the Government, Robertson opened a private law practice in Los Angeles emphasizing criminal defense work for drug traffickers. In November, 1983, Julio Silva–Lopera (Silva) retained Robertson to defend him on a federal cocaine charge. Silva told Robertson that he had two kilos of cocaine and $980,000 concealed in the trunk of his Cadillac parked near his Reseda home. Silva asked Robertson to contact his wife and have the Cadillac placed in storage so that he could dispose of the contents when he was released from jail.

About one week later, Robertson showed up at his estranged wife's house in Phoenix driving the Cadillac. His then wife, Eddra McCarthy, saw a large amount of money and two kilos of cocaine in the trunk. Robertson told his wife to open a safe deposit box at a Phoenix bank and place the money there. He put the Cadillac in storage in Phoenix for a year. Robertson also instructed his wife to transfer the money in amounts less than $10,000 into different bank accounts in the Phoenix area. When Silva asked him about his Cadillac, Robertson told Silva that AAA had been unable to locate his car. Silva discharged Robertson. In February, 1984, Robertson stopped practicing law and moved to Arizona where he made several large cash purchases, including a house.

Walter Guarderas and his cousin Marco were drug traffickers and Robertson's former clients. In November, 1984, Walter and Marco received a thirty-kilogram shipment of cocaine from New York. Walter delivered twenty kilos of the cocaine to Marco at his house in Torrance, California. As Walter was leaving, he spotted a car he recognized as Robertson's parked outside Marco's house. Walter testified that he knew Marco was having difficulty getting paid for the cocaine he had apparently sold on credit. Walter never saw Marco again.

In mid-January, 1985, Robertson arrived at his home in Phoenix with a suitcase full of cocaine and cash. Robertson poured cocaine on the kitchen table and Eddra poured the cocaine down the sink. Robertson then hit her, dragged her down the hallway to the bedroom and showed her the contents of the suitcase (cocaine and about $400,000). He then stated, "What do you think this is all about? This is going to make us a lot of goddamned money!"[1]

---

\* Honorable Frank A. Kaufman, Senior United States District Judge for the District of Maryland, sitting by designation.

1. This statement was the edited version presented to the jury. In fact, the statement included in the presentence report is as follows: "What do you think this is all about? I just killed Marco Guarderas! This is going to make us a lot of goddamned money!" Reference to the killing was ruled inadmissible as a confidential marital communication.

In January, 1985, Robertson moved in with a married couple in Phoenix where they witnessed Robertson handling hundreds of thousands of dollars and large quantities of cocaine. When Robertson learned that the husband was interested in gold mining in Alaska, Robertson agreed to finance a gold mining partnership in Alaska called Double Eagle Mining Co. After Robertson and the husband's son entered into a partnership agreement, the partnership purchased placer gold mining claims near Fairbanks ($125,-000), mining equipment ($100,000), and travel expenses for seven employées. Robertson paid for nearly all of these expenses in cash. The partnership was soon dissolved but Robertson continued operating the mine through 1987 as Robertson Mining Co. In order to finance the mining operation for the 1986 season, Robertson applied for a $300,000 loan using his Arizona home for collateral. Silva's Cadillac was driven to Alaska for use in the mining operation.

In 1980 or 1981 when he was in Los Angeles, Robertson had asked Dean Stephens to sell cocaine for him on a few occasions. After Stephens did so, he turned over the money to Robertson less his commission. Robertson continued to supply Stephens with cocaine to sell after Stephens moved to San Diego in 1984. This drug trafficking operation with Stephens continued through 1987.

In 1986, Robertson's former client, Rodriguez, and an immigration consultant, Maldonado, offered to supply Robertson with cocaine for resale. During October, 1986, and March, 1987, Robertson was involved in a series of drug transactions whereby Rodriguez, Maldonado, and Giron supplied cocaine to Robertson who then sold it to Stephens. Stephens then sold the cocaine to other dealers, including Elizabeth Grove and Cheryl Ledford.

The district court authorized a wiretap for Grove's telephone on January 9, 1987. Two weeks later she was arrested for possession of one kilogram of cocaine which was Robertson's. Robertson agreed with Dean Stephens that it would be in his best interests to represent Grove.

In May, 1987, Rodriguez told Robertson that Maldonado had been kidnapped by Peruvian cocaine traffickers who were demanding ransom for his release. Rodriguez and Robertson negotiated for Maldonado's release. The Peruvians released Maldonado after Rodriguez delivered five kilograms of cocaine. Robertson told his new wife, Sue Canada, that he had negotiated the release of his client who had been kidnapped.

In June, 1987, after Maldonado received a large amount of cash from cocaine dealers, he gave Enrique Dulong a suitcase containing $420,000 of that cash and two ounces of cocaine for safekeeping. Maldonado was soon arrested and retained Robertson to defend him. Robertson contacted Dulong and asked him for $30,000 which Dulong gave him from the suitcase. Via a note given to Robertson, Maldonado authorized Dulong to release $250,000 to Robertson. Robertson told Maldonado that as soon as he was released on bail, he should flee and that the $250,000 would be used as a contingency fund to pay off the bail bond. Dulong released $200,000 to Robertson on August 12, 1987. When Maldonado was released on bail, he asked Robertson about the money and was told that it was in a trust account in Robertson's name and the name of the bail bondsman. Maldonado did not flee and told Robertson to return the money to Dulong, which he never did. Robertson only gave $25,000 to the bondsman and never returned the remaining amount to Maldonado or Dulong. The bondsman later returned the $25,000 to Robertson. Robertson instructed Sue Canada to place shoe boxes full of cash in a safe deposit box and then to deposit money in increments less than $10,000 into the bank at various times. The checking account was used beginning July 17, 1987, and Canada made the last deposit on November 2, 1987.

On October 17, 1991, a federal grand jury for the Southern District of California returned an eight-count superseding indictment against Robertson charging him with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count One); possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Counts Two, Three & Four); use of a communication facility in furtherance of a narcotics felony in violation

of 21 U.S.C. § 843(b) (Count Five); racketeering activity in violation of 18 U.S.C. § 1962(a) (Count Six); RICO forfeiture, 18 U.S.C. § 1963 (Count Seven); and continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848 (Count Eight). The jury found Robertson guilty as to Counts One through Four and Six and not guilty on Counts Five and Eight. The jury was undecided as to Count Seven and it was later dismissed.

Robertson was sentenced to twenty years imprisonment to run concurrently on all counts with five years of supervised release. The district court did not sentence Robertson pursuant to the Sentencing Guidelines. Both Robertson and the Government appeal.

### III

### DISCUSSION

#### A. RICO

Robertson argues that the Government failed to prove that the RICO enterprise affected interstate commerce. We agree. A violation of 18 U.S.C. § 1962(a)[2] requires proof of the following elements: (1) a person receives income derived directly or indirectly from a pattern of racketeering activity; (2) that person uses or invests, directly or indirectly, any part or proceeds of such income in the acquisition of any interest in, or the establishment or operation of any enterprise; and (3) that enterprise is engaged in or its activities affect interstate or foreign commerce.

■■■ To constitute a RICO violation, the enterprise must be engaged in or affect interstate commerce. 18 U.S.C. § 1962(a). The Government must prove that the activities of the enterprise itself affect interstate commerce and not that each predicate act affects interstate commerce. *United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir. 1981), *cert. denied sub nom. Walgren v. United States*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *see also United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979), *cert. denied sub nom. Little v. United States*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). However, in determining whether the interstate commerce nexus results from the enterprise, "[i]t is permissible to find that nexus from acts also charged as predicate acts *when those constitute the activities of the enterprise.*" *Bagnariol*, 665 F.2d at 893 (emphasis added). "A minimal effect on interstate commerce satisfies this jurisdictional element." *Id.* at 892. Because the mining venture was separate from the criminal activity, the predicate acts are not considered in the interstate commerce analysis.

■■ In *Musick v. Burke*, 913 F.2d 1390 (9th Cir.1990), we held that the interstate nexus requirement is not satisfied "where local activities have incidental effects on interstate commerce." *Id.* at 1398. Similarly, in this case, the Government failed to establish that the RICO enterprise had anything more than an incidental effect on interstate commerce. There was no evidence introduced to show that the activities of the enterprise itself affected interstate commerce. The Government argues that the interstate commerce requirement was satisfied by proof that Robertson invested large amounts of money in the Alaska gold mine which was derived from the Arizona and California racketeering acts. However, apart from those predicate acts, there was no evidence to show that the activities of the mine, or the profits obtained therefrom, affected interstate commerce. The evidence at trial established that, with the exception of a few nuggets which Robertson kept, none of the gold obtained from the mine was sold outside Alaska. The mine was a relatively small and entirely local operation, only producing approximately $200,000 in gold. The Government failed to prove an effect on interstate commerce by showing, for example, that the

---

**2.** Section 1962(a) provides in pertinent part:
It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such

income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
18 U.S.C. § 1962(a).

money produced by the gold mine funded the illegal predicate acts.

▇ During oral argument, the Government also contended that it proved the requisite interstate commerce nexus with evidence that Robertson had purchased supplies and equipment and had hired employees outside Alaska. In *Musick,* however, we rejected a similar argument when we held that RICO jurisdiction can be no less than that required under the Sherman Act. *Musick,* 913 F.2d at 1398. The purchase of "equipment and supplies drawn generally from the stream of interstate commerce" is insufficient to establish the interstate nexus required under RICO. *Id.* at 1397. Given that Alaska is fairly isolated, most supplies must be shipped there via interstate commerce. Carried to its logical conclusion, the Government's argument would require us to find that any local Alaskan operation has an effect on interstate commerce merely because supplies, equipment and employees are shipped there. We decline to do so.

▇ For the same reason, we reject the Government's arguments that Robertson's use of an airplane to fly from Arizona to Alaska and his use of the Cadillac in connection with the mine were sufficient to establish the requisite impact on interstate commerce. These activities had, at most, only an incidental effect on interstate commerce. Therefore, absent proof that the RICO enterprise itself had more than an incidental effect on interstate commerce, we reverse the RICO conviction.

### B. *Prejudicial Effect of Predicate Acts*

▇ Robertson contends that racketeering acts 6 and 7 were so prejudicial as to contaminate the entire trial and therefore, he argues, the remaining counts should be reversed. We reject this contention. Predicate acts 6 and 7 pertained to Robertson's stealing money and property from Silva and

Guarderas. The district court issued an instruction requiring the jury to consider each count separately. It also instructed the jury that their verdict on one count should not control on any other count. The jury is presumed to have followed the instructions and not to have confused the evidence pertinent to separate counts. *See United States v. Parker,* 432 F.2d 1251, 1255 (9th Cir.1970), *cert. denied,* 404 U.S. 836, 92 S.Ct. 121, 30 L.Ed.2d 67 (1971). Therefore, we conclude that because the jury was to consider each count separately, Robertson was not prejudiced by evidence establishing a separate count. Moreover, the fact that the Government failed to establish the RICO count does not mean that it exceeded its wide discretion in deciding what charges to bring.[3]

### C. *Evidentiary Issues*

Robertson next contends that the district court erred in admitting several items of evidence. The challenged evidence can be characterized as prior bad act evidence, with the exception of the drug ledger evidence.

▇ The district court's construction of Fed.R.Evid. 404(b) is a question of law reviewed *de novo. United States v. Bibo–Rodriguez,* 922 F.2d 1398, 1400 (9th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991). This court reviews for abuse of discretion the district court's decision to admit prior bad act evidence under Fed.R.Evid. 404(b). *United States v. Hegwood,* 977 F.2d 492, 496 (9th Cir.1992), *cert. denied sub nom. Wilson v. United States,* — U.S. —, 113 S.Ct. 2348, 124 L.Ed.2d 257 (1993). Similarly, the district court's decisions regarding relevance and prejudice are reviewed for abuse of discretion. *United States v. Daly,* 974 F.2d 1215, 1216–17 (9th Cir.1992).

---

**3.** Robertson raises several other issues with regard to the RICO conviction. He contends that the district court erred in: (1) denying his request for a special verdict on the RICO count; (2) refusing to dismiss the RICO count for lack of venue; (3) denying his motion to sever the RICO and CCE counts; (4) excluding Agent Devetko's testimony relating to the RICO charge; and, (5) denying CJA funds to locate a defense witness who was allegedly the owner of the stolen Cadillac which served as a predicate act (racketeering act six). He also claims that the RICO statute is unconstitutionally vague. Because we reverse the RICO count on interstate commerce grounds, we need not address these contentions.

Prior bad act evidence can only be admitted under Fed.R.Evid. 404(b)[4] if that evidence: (1) tends to prove a material point; (2) is not too remote in time; (3) is based upon sufficient evidence; and, (4) in some cases, is similar to the offense charged. *Bibo–Rodriguez,* 922 F.2d at 1400; *see also United States v. Houser,* 929 F.2d 1369, 1373 (9th Cir.1991). Finally, even if the evidence satisfies those four prerequisites, it may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *Bibo–Rodriguez,* 922 F.2d at 1400–01.

### 1. *Disappearance of Marco Guarderas*

■ The Government introduced evidence that Robertson purchased twenty kilos of cocaine from Marco and that Marco was unable to obtain payment for the cocaine. Walter Guarderas, Marco's cousin, testified that he was aware of Marco's unsuccessful efforts to collect from Robertson. He also testified that he had seen a car similar to Robertson's parked at Marco's house and that he never saw Marco again. We conclude that it was error to admit evidence of Marco's disappearance. Such evidence was inadmissible under Rule 404(b) because it did not tend to prove a material element of any of the charged offenses.

■ Although we conclude that it was error to admit such testimony, we need not reverse the drug convictions if we find that the error was harmless. *United States v. Brown,* 880 F.2d 1012, 1016 (9th Cir.1989). "[A]n erroneous admission of evidence is harmless if it is more probable than not that its admission did not affect the jury's verdict." *United States v. Harrison–Philpot,* 978 F.2d 1520, 1527 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2392, 124

L.Ed.2d 294 (1993). We find that the error was harmless. The Government did not argue in closing that Marco's disappearance was the result of foul play attributed to Robertson. *Cf. Brown,* 880 F.2d at 1016 (error to admit prior bad act evidence not harmless where there were continued references to prior bad acts in closing argument). Nor did the jury hear Robertson's statement that he killed Marco. Given the limited reference to the incident over the course of the fourteen-day trial, we find that a rational jury would not have drawn the inference that Robertson killed Marco.

Furthermore, the evidence at trial overwhelmingly established Robertson's guilt on the drug charges. The jury heard evidence from several Government witnesses that Robertson was trafficking cocaine as charged in the indictment. Maldonado testified that he supplied cocaine to Robertson. Sandy and Dean Stephens testified that they obtained cocaine from Robertson to sell. No evidence was admitted to connect Robertson to the murder and there was no argument on the Government's part linking Robertson to Marco's murder. Therefore, we are convinced that the error was harmless in light of both the overall strength of evidence against Robertson on the drug counts and the minimal reference to Marco's disappearance which occurred during a lengthy trial.[5]

### 2. *Drug Use*

■ Similarly, there is no need to decide whether the admission of evidence of Robertson's drug use was error, since we are convinced that any such error was harmless. As described above, there is overwhelming direct evidence to support his convictions, including the testimony of witnesses who recounted numerous occasions when he pos-

---

**4.** Fed.R.Evid. 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

**5.** We note that Robertson did not make a contemporaneous objection to the testimony regarding Marco's disappearance. Prior to its admis-

sion, however, the Government made an offer of proof as to the content of Walter Guarderas' testimony and at that time Robertson objected on relevance grounds. The Government has not argued that Robertson waived this objection and that our review should be under the plain error standard. Nor do we conclude that our review should be for plain error. Robertson raised his relevance objection immediately preceding Walter's testimony and it arguably covers the issue raised here.

sessed and distributed large quantities of cocaine.[6]

### 3. *Drug Possession*

[15] The Government introduced evidence that Robertson had possessed varying quantities of drugs from 1983 through 1987. Robertson contends that the testimony of several witnesses who observed Robertson in possession of cocaine was irrelevant. We disagree. Where large quantities of drugs are involved, "[w]e have consistently held that evidence of a defendant's prior possession or sale of narcotics is relevant under Rule 404(b) to issues of intent, knowledge, motive, opportunity, and absence of mistake or accident in prosecutions for possession of, importation of, and intent to distribute narcotics." *United States v. Mehrmanesh,* 689 F.2d 822, 832 (9th Cir.1982).

Robertson denied possessing drugs for distribution purposes. He also denied ever possessing more than an ounce of cocaine. The jury was properly entitled to draw the inference that because Robertson possessed large quantities of drugs, he intended more than personal use. *See id.* Therefore, evidence of Robertson's prior drug possession was relevant and admissible to establish his intent to distribute, an element the Government was required to prove on the offenses charged in Counts One through Four.

### 4. *Maldonado/Dulong Theft*

 The evidence at trial indicated that Robertson stole approximately $200,000 and two ounces of cocaine from Maldonado which Maldonado had placed with Dulong for safekeeping. Sue Canada testified that she maintained a joint checking account with Robertson in which only this drug money was deposited in amounts less than $10,000. She testified that none of the money which

Robertson may have earned in legal fees in 1987 (the year when the money was stolen) was deposited into this account. This evidence was relevant to establish an element of the RICO charge (the money laundering predicate act), and was therefore properly admissible.

### 5. *Forgery*

 Robertson's tax attorney, Connell, testified that his signature was forged on Robertson's loan documents. During cross-examination Robertson admitted to forging Connell's signature on those documents. The Government argues that the forged loan documents were relevant to establish that Robertson had little legitimate income during the period he was involved in illegal drug activity (1984–1987); that his only income was from illegal drug activity; and that he was therefore forced to mask his illegal income when he applied for a loan. We agree.[7]

The evidence was admissible to establish an element of the RICO charge. The evidence indicated that after Robertson purchased a home in Arizona with money he had stolen from Silva in California, he applied for a loan to finance the mining operation in Alaska and used the Arizona home as collateral for the loan. The loan documents were relevant to establish the connection between the stolen property and the RICO enterprise. The false statements and forgeries contained in the loan documents were similarly relevant in showing that Robertson was masking illegal income and that the illegal income was used to invest in the mine. Such proof was necessary to establish one of the predicate acts, interstate transportation of stolen property and the investment of that illegally obtained money into the RICO enterprise.

---

6. Evidence of prior drug use is ordinarily not relevant under Rule 404(b) to prove conspiracy and possession with intent to distribute narcotics. *See United States v. Hill,* 953 F.2d 452, 456–58 (9th Cir.1991); *see also United States v. Mehrmanesh,* 689 F.2d 822, 831–32 (9th Cir. 1982). An exception to this rule covers certain narrow circumstances (*see Hegwood,* 977 F.2d at 497), but we find no need to decide if it applies here.

7. The Government argues that we should review this issue under the plain error doctrine because Robertson failed to object. We decline to do so because Robertson objected immediately preceding Connell's testimony on several grounds, including relevance and undue prejudice. Therefore, we do not find that Robertson waived his objection.

### 6. *False Loan Applications & Filing False Tax Returns*

At the time of the trial, Robertson was facing prosecution for making false statements and tax evasion in Arizona. Robertson argues that the district court should have sustained his objection on Fifth Amendment grounds. We disagree that the admission of the evidence violated Robertson's right against self-incrimination. "A defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined on matters made relevant by his direct testimony.... The scope of the defendant's waiver is coextensive with the scope of the relevant cross-examination." *United States v. Black,* 767 F.2d 1334, 1341 (9th Cir.) (citations omitted), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985). On cross-examination, the Government may ask questions which are " 'reasonably related' to the subjects covered by the defendant's testimony." *United States v. Hearst,* 563 F.2d 1331, 1340 (9th Cir.1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

During direct examination, Robertson testified that he had refinanced his house for $300,000. The Government was properly permitted to cross-examine him about this transaction in an attempt to elicit the fact that the loan applications were false and that the money obtained was invested in the mine. Robertson also testified that the money he had invested in the Alaska gold mine was not obtained from illegal activity. He testified on direct that the only illegal activity he had engaged in was tax evasion, but that the money was obtained legally from his practice of law. The Government was properly permitted to cross-examine Robertson regarding the filing of the false tax returns, activity which he admitted on direct. Cross-examination on both of these matters was reasonably related to his direct testimony. Consequently, the district court did not err in overruling Robertson's objection on self-incrimination grounds.[8]

### 7. *Spousal Violence*

Robertson contends that the district court erred in admitting Eddra McCarthy's testimony that after she had poured cocaine down the sink, Robertson dragged her by her hair into the bedroom. He argues that such evidence of spousal violence was a violation of Rule 404(b) and, in any event, was unduly prejudicial. McCarthy also testified that Robertson had stated: "What do you think this is all about? This is going to make us a lot of goddamned money!" We conclude that this testimony was relevant to establish not only Robertson's drug dealing activity but his state of mind. *See* Fed.R.Evid. 404(b). Robertson's violent reaction to her destruction of the cocaine tended to establish the scope of his drug dealing involvement as well as its importance to him. A person in possession of cocaine for personal use would be unlikely to have responded in the way Robertson did, either physically or verbally. The district court did not abuse its discretion in ruling that the probative value of this evidence outweighed any prejudicial effect.

### 8. *Drug Ledger*

Robertson argues that the admission of a drug ledger was irrelevant and prejudicial. The drug ledger was admitted with the testimony of an expert who testified that the ledger evidenced drug transactions. Robertson admitted during cross-examination that the ledger was his; however, he denied that the majority of the entries pertained to drugs. The jury was free to disregard Robertson's explanation that the majority of the ledger entries related to gold transactions. Admission of the drug ledger was relevant to establish Robertson's connection to the drug trafficking charges in the indictment and we conclude the district court did not err in admitting it.

Finally, Robertson argues that prior to admission of all Rule 404(b) evidence, the district court failed to balance the probative value of the evidence with its prejudicial impact. However, to the extent Robertson's argument relies upon a requirement for re-

---

8. Robertson also argues that the evidence was irrelevant and inadmissible under Rule 404(b). We reject this argument. The evidence was ad-

missible for the same reasons we stated in III. C.5., *supra.*

cital of the Rule 403 test, it lacks merit. "The district court need not recite the Rule 403 test when balancing the probative value of evidence against its potential for unfair prejudice." *Daly*, 974 F.2d at 1217; *see also United States v. Johnson*, 820 F.2d 1065, 1069 (9th Cir.1987) (upheld admission of Rule 404(b) evidence, finding that district court implicitly engaged in Rule 403 balancing of probative value against prejudicial effect). Because Robertson argued before the district court that admission of the prior bad act evidence would be unduly prejudicial, we find that the district court implicitly engaged in the requisite balancing, even though it did not explicitly state that it was doing so on the record. *See Johnson*, 820 F.2d at 1069. However, we again emphasize the importance of explicit rulings as this facilitates appellate review and ensures that the parties' objections are addressed on the record. *See id.* at 1069 n. 2.

Accordingly, after carefully reviewing the entire trial transcript, we are convinced that it is more probable than not that the erroneous admission of Marco's disappearance did not affect the jury's verdict.[9]

### D. *Motions for Continuance*

Robertson next argues that the district court erred in denying his motions for continuance. The district court's decision to deny a motion for continuance is reviewed for abuse of discretion. *United States v. Tham*, 960 F.2d 1391, 1396 (9th Cir.1992). We do not find an abuse of discretion unless the denial is arbitrary and unreasonable given the following four factors: "(1) the extent of the defendant's diligence in readying the defense; (2) the likelihood that the continuance would have satisfied the defendant's need; (3) the inconvenience to the court, opposing party, and witnesses; and (4) the extent to which the defendant may have been harmed." *Id.* In order to constitute reversible error, "the defendant must show that the denial resulted in actual prejudice to his defense." *Id.*

The district court granted Robertson two continuances—first from September 17, 1991, to November 19, 1991, and then to January 22, 1992. It denied Robertson's third motion for continuance which came on January 21, 1992, the day before trial was to commence. Robertson argues that he did not have time to prepare for trial because the Government failed to release Jencks Act materials three days prior to the testimony of the witness pursuant to the district court's order.

"*After* a prosecution witness testifies, the Jencks Act requires that the government produce any 'statements' made by a witness in its possession that relate to the subject matter of the trial testimony." *United States v. Kerr*, 981 F.2d 1050, 1052 (9th Cir.1992) (emphasis added). Although the Jencks Act does not require disclosure prior to witness testimony, the district court ordered the Government to provide the Jencks Act materials three days in advance of each witness's testimony. Robertson contends that the Government repeatedly failed to provide those materials three days in advance.

Robertson has failed to demonstrate that the denial of a continuance resulted in actual prejudice to his defense. *See Tham*, 960 F.2d at 1396. Indeed, in the example Robertson cites in which the Government was late in providing materials, the district court granted him a one-half day recess to prepare. He does not explain specifically how the Government's tardiness resulted in actual prejudice to his case. Therefore, the district court did not abuse its discretion in denying his third motion for continuance the day before trial.

### E. *Bill of Particulars*

Robertson next claims that the district court erred in denying his motion for a bill of particulars. A bill of particulars was not necessary in this case because the indictment apprised Robertson of the specific charges against him, thereby minimizing the danger of surprise at trial; aided him in

9. Because we find only one evidentiary error, we need not reach Robertson's argument regarding the cumulative effect of Rule 404(b) errors.

preparing for trial; and protected him against double jeopardy. *See United States v. Long,* 706 F.2d 1044, 1054 (9th Cir.1983). The indictment contained the names of alleged coconspirators, the approximate dates on which the alleged illegal conduct occurred, and the overt acts that comprised the illegal activity. *See United States v. DiCesare,* 765 F.2d 890, 897–98 (9th Cir.) (bill of particulars not warranted when defendant seeks to obtain coconspirator names, exact dates and overt acts), *amended on other grounds,* 777 F.2d 543 (1985).

Moreover, Robertson "fails to demonstrate surprise, prejudice, or an increased risk of double jeopardy stemming from the alleged shortcomings of the indictment." *United States v. Burt,* 765 F.2d 1364, 1367 (9th Cir.1985). His conclusory statements to that effect are insufficient to establish prejudice. *See id.* The indictment apprised Robertson of the charges against him and enabled him to prepare an adequate defense. *See DiCesare,* 765 F.2d at 897. Nothing more is required. Therefore, the district court did not abuse its discretion in denying Robertson's motion for a bill of particulars. *See Long,* 706 F.2d at 1054.

### F. *Wiretap Evidence*

■ Robertson claims that the district court erred in refusing to suppress wiretap evidence obtained from the residences of Elizabeth Grove and Dean Stephens. Our review of the district court's determinations under the wiretap statute (18 U.S.C. § 2518) is deferential. *United States v. Brown,* 761 F.2d 1272, 1275 (9th Cir.1985). Review is *de novo* as to whether there was a "full and complete statement," but we review the district court's conclusion as to necessity for an abuse of discretion. *Id.*

Authorization of a wiretap requires two findings: (1) probable cause to believe that "an individual is committing, has committed, or is about to commit certain offenses including narcotics violations, that relevant communications will be intercepted by the wiretap, and that targeted persons will use the targeted facility," *id.* (internal quotations and citations omitted); 18 U.S.C. § 2518(3)(a); and (2) "normal investigative procedures have

been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Brown,* 761 F.2d at 1275; 18 U.S.C. § 2518(3)(c). Finally, the applicant seeking the wiretap must provide the judge with "a full and complete statement" establishing the necessity requirement. 18 U.S.C. § 2518(1)(c).

■ The factual statements contained in the wiretap affidavits establish probable cause to believe that Elizabeth Grove and Dean Stephens were engaged in drug trafficking. The affidavits also contain full and complete statements demonstrating the necessity requirement. For example, they explain that the agents had been unable to obtain the cooperation of coconspirators and that further undercover operations in the form of fronting funds would be high-risk as it could result in rip-offs. The affidavits also state that physical surveillance of Grove while operating her vehicle proved unsuccessful and that the use of a stationary surveillance camera at Grove's residence was similarly unsuccessful. The affidavits also explain why other investigative techniques reasonably appear unlikely to succeed, e.g., vehicle tracking devices and search warrants. The affidavits contain sufficient factual support, Robertson's arguments to the contrary notwithstanding.

### G. *Presentence Report*

Finally, Robertson contends that the district court erred in failing to comply with Fed.R.Crim.P. 32 by refusing to correct the presentence report (PSR) which contained Robertson's statement to his wife that he had killed Marco Guarderas.

■ Fed.R.Crim.P. 32(c)(3)(D) provides: If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A

written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.

We require strict compliance with Rule 32. *United States v. Fernandez–Angulo*, 897 F.2d 1514, 1516 (9th Cir.1990). If the district court fails to comply with Rule 32 when a defendant challenges the factual accuracy of matters contained in the PSR, we must vacate the sentence and remand for resentencing. *Id.*

■ In this case, Robertson challenged the statement he had made to his wife regarding the murder of Marco Guarderas. He denied ever having made that statement and moved that it be stricken from the PSR. The district court denied that motion, stating only that the fact that the statement was inadmissible at trial did not require that it be stricken from the PSR. The district court failed to comply with either requirement under Rule 32. It did not make an explicit finding as to the accuracy of the statement. Nor did it unambiguously and expressly state that it would not take the controverted matter into consideration when imposing the sentence. *See id.* at 1516 n. 2.

> If the district court states that the controverted matters will not be considered in imposing sentence, the sentencing record must unambiguously reflect that the district court placed no reliance on the controverted matters. If the record is ambiguous in this regard, the sentence must be vacated and remanded for resentencing.

*Id.* The district court did not state that it would not consider the controverted statement. Therefore, we vacate the four drug conviction sentences (Counts One through Four) and remand for resentencing.[10]

### H. *Sentencing*

The Government appeals Robertson's sentence contending that the district court erred in failing to sentence Robertson pursuant to the Sentencing Guidelines because one of the

predicate acts (structuring deposits in violation of 18 U.S.C. § 1956(a)(3)) occurred after the enactment date of the Guidelines. *See United States v. Kohl*, 972 F.2d 294, 297–98 (9th Cir.1992) (where there is a continuing offense (drug conspiracy) which begins prior to the Guidelines' effective date (November 1, 1987) and continues after that date, the Guidelines apply). However, we need not reach this issue because the Government's straddle argument is based only upon racketeering conduct occurring after the effective Guideline date. Because we reverse the RICO conviction, the Guidelines clearly do not apply. The drug convictions which we affirm involve conduct that occurred prior to the effective date of the Guidelines.

### CONCLUSION

Because the Government failed to prove that the RICO enterprise affected interstate commerce, we REVERSE the RICO conviction. We AFFIRM the drug convictions on Counts One through Four, but because the district court did not comply with Fed. R.Crim.P. 32, we VACATE the drug conviction sentences and REMAND for resentencing.

REINHARDT, Circuit Judge, concurring specially:

I fully concur in Judge T.G. Nelson's opinion for the court. I write separately, however, in order to express my concern over two aspects of the prosecution's conduct: first, overcharging, second, the improper introduction into evidence of unrelated bad acts. These practices unfortunately appear all too frequently in prosecutions these days.

The defendant in this case was deeply involved in the illegal drug trade. He also owned an unprofitable but legal gold mine. Rather than simply prosecuting the defendant on the basis of the overwhelming evidence of his illicit drug activity, the prosecutors—perhaps because of RICO's severe imprisonment and forfeiture provisions,[1] per-

---

10. We also note that it is insufficient if, on remand, the district court states that it did not rely upon the disputed material when imposing the sentences. Rather, resentencing is required after

strict compliance with Rule 32. *See Fernandez–Angulo*, 897 F.2d at 1516.

1. Enhanced sanctions available under RICO include 20 years imprisonment, a $25,000 fine, or

haps because the use of that statute permits the prosecution to introduce evidence of criminal acts that would otherwise be barred[2]—decided to turn the defendant's ownership of a gold mine into the centerpiece of his prosecution. Notwithstanding the gold mine's tenuous nexus with interstate commerce, Robertson was charged with investing income derived from a pattern of racketeering activity in an "enterprise . . . engaged in, or the activities of which affect interstate or foreign commerce," in violation of the RICO statute. In doing so, the prosecution immeasurably complicated the trial and substantially increased the burden on the defendant.

The practice of overcharging a defendant[3] involves an abuse of the prosecutor's generally unreviewable discretion. Of necessity, courts are reduced to expressing concern over the practice and their inability to do anything about it. See, e.g., Bordenkircher, 434 U.S. at 368 n. 2, 98 S.Ct. at 670 n. 2 (Blackmun, J., dissenting); United States v. Andrews, 612 F.2d 235, 241–42 n. 7 (6th Cir.1979), reh'g en banc, 633 F.2d 449 (1980), cert. denied sub nom. Brooks v. United States, 450 U.S. 927, 101 S.Ct. 1382, 67 L.Ed.2d 358 (1981); Andrews, 612 F.2d at 256 n. 23 (Keith, J., dissenting).[4] The result is that "overcharging . . . continue[s] to occur

both, and forfeiture of ill-gotten gains and of any interest in an enterprise that was used to violate the statute. 18 U.S.C. § 1963. As one commentator noted, "the disparity of scale between the RICO sanctions and those of some of its predicate actions suggests that the prosecutor's ability unilaterally to declare a crime major or minor has been dramatically increased." Lynch, RICO: The Crime of Being a Criminal (pt. II), 87 Colum.L.Rev. 661, 723 (1987).

2. RICO's predicate act requirement is satisfied if the prosecution shows at least two acts of racketeering activity occurring within ten years of each other, 18 U.S.C. § 1961(5), so that evidence of crimes that would otherwise be barred by the statute of limitations may be admissible. Thus, in this case, prosecutors were able to offer evidence of crimes occurring in 1983 and 1985, which were not independently charged but were relevant only as RICO predicate offenses. Although the district judge specifically instructed the jury not to allow evidence relevant to one count to taint its consideration of the other charges, the admission of such evidence is, at the very least, an added worry for the defense.

In other cases, the addition of an overarching RICO charge may allow prosecutors to join disparate offenses in a single trial, where joinder might otherwise be deemed unduly prejudicial. See Lynch, supra note 1 (pt. III), at 927–28 (noting that "[t]his motivation for use of RICO is especially strong where the offenses sought to be joined are very serious and prejudicial, and thus particularly likely to be severed").

3. Justice Blackmun has described prosecutorial overcharging as when prosecutors bring "charges more serious than they think appropriate for the ultimate disposition of a case." Bordenkircher v. Hayes, 434 U.S. 357, 368 n. 2, 98 S.Ct. 663, 670 n. 2, 54 L.Ed.2d 604 (1978) (Blackmun, J., dissenting). Similarly, the commentary to the ABA Standards Relating to the Function of the Prosecutor notes that:

[a]lthough it is difficult to give a definition of "overcharging," the heart of the criticism is the belief that prosecutors bring charges not in

the good faith belief that they are appropriate under the circumstances and with an intention of prosecuting them to a conclusion, but merely as a harassing and coercive device in the expectation that they will induce the defendant to plead guilty.

Id. § 3–3.10 commentary at 3.59. As such, prosecutorial overcharging includes but is not limited to bringing charges unsupported by probable cause.

4. Practical problems of proof, bolstered by prudential and arguably constitutional concerns, have led the judiciary effectively to tolerate the practice. As Justice Blackmun pointed out in Bordenkircher, prosecutorial overcharging is difficult or even impossible to prove. See 434 U.S. at 368 n. 2, 98 S.Ct. at 670 n. 2 (Blackmun, J., dissenting). If the defendant is acquitted of a charge, the original charging decision escapes appellate review. In other circumstances, the rule of deference to the prosecutor is so firmly established that judicial review of the prosecutor's charging decisions is, in effect, an empty exercise. See, e.g., Wayte v. United States, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (explaining that prosecutor's "broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review"). A recent decision of this court, decided on review of a plea bargain, particularly illustrates the judicial reluctance to interfere in matters involving the prosecutor's charging discretion and suggests its constitutional underpinnings. In United States v. Redondo–Lemos, 955 F.2d 1296 (9th Cir.1992), the court rejected a defendant's constitutional challenge to the prosecutor's charging decision and refused to evaluate whether the prosecutor's discretion had been exercised in an arbitrary and capricious manner. The court reasoned that charging decisions "involve exercises of judgment and discretion that are often difficult to articulate in a manner suitable for judicial evaluation," and that, furthermore, serious separation of powers questions would be raised by judicial supervision of prosecutorial charging discretion. Id. at 1299–1301.

regularly, without meaningful judicial review or correction." Gershman, *The New Prosecutors*, 53 U.Pitt.L.Rev. 393, 408 (1992); *see generally* A. Goldstein, The Passive Judiciary: Prosecutorial Discretion and the Guilty Plea (1981).

While it is impossible to gauge precisely how often overcharging occurs, it is easy to understand some of the reasons why it occurs. Plea bargaining is now the mainstay of our criminal law system, and excessive charges give the prosecutor added leverage in the plea bargaining process. Because of the threat of prosecution on such charges, defendants may be induced to plead guilty on more unfavorable terms than might otherwise be fair or reasonable. The risk of going to trial may simply become too great, even in cases in which the defendant may arguably be innocent of some of the charges. Moreover, beyond the plea bargaining stage, overcharging may facilitate a compromise verdict in which the jury channels its doubt as to the defendant's guilt into acquitting him on some charges but not others. Thus, while a defendant who chooses not to proffer a guilty plea may successfully resist prosecutorial overcharging by winning a judgment of acquittal, or, as in this case, having his conviction overturned on appeal, these possibilities hardly amount to adequate protection against the practice. Primarily, defendants must rely for fair treatment on the prosecution's responsible use of its discretion.

The RICO statute seems particularly susceptible to prosecutorial abuse, given that its scope is broad and somewhat ill-defined, and its penalties are severe. Although the Second Circuit has led the way in attacking misuse of RICO, this circuit too has acknowledged the problem. *See, e.g., United States v. Malizia*, 720 F.2d 744, 745 (2d Cir.1983); *United States v. Ivic*, 700 F.2d 51, 64–65 (2d

Cir.1983); *United States v. Thordarson*, 646 F.2d 1323, 1329 n. 10 (9th Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981); *United States v. Huber*, 603 F.2d 387, 395–96 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). At any rate, the fact of overzealous prosecutions under RICO at this late date is even less justifiable than with these earlier cases. With a growing body of case law to delineate the statute's scope, it is reasonable to expect greater prosecutorial restraint in its application.

Besides overcharging, there is another respect in which the prosecution in this case strayed dangerously close to the line separating a fair conviction from an unfair one. Not content to rely on the overwhelming legitimate evidence of Robertson's drug trafficking, the prosecution submitted evidence implicating Robertson in murder, spousal abuse and drug use.[5] As Justice Jackson explained in *Michelson v. United States*, 335 U.S. 469, 476, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948), a jury presented with evidence of such "bad acts" is liable "to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." Faced with a defendant who they suspect is a murderer, wife-batterer and drug addict, jurors might well believe they are letting him off easy by convicting him for the crimes charged in the indictment.

Accordingly, the Federal Rules of Evidence declare as a general principle that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). As a subset of the larger rule that evidence of bad character is not ordinarily admissible to support an inference of bad conduct, the rule barring bad act evidence possesses "almost

The court did, however, distinguish the requirement of probable cause for prosecution, for which, as past cases establish, judicial scrutiny is appropriate. *Id.* at 1300 n. 5.; *see also United States v. Sanchez*, 908 F.2d 1443, 1445 (9th Cir. 1990).

5. Given the liberal abuse of discretion standard applicable to the evidentiary decisions of the district court, and the facts of in this particular case, we do not hold that the admission of evidence of spousal abuse was error. Our failure to reverse on this issue, however, should not be interpreted as tacit approval of the admission of such evidence generally. Instead, it should be emphasized that the admission of evidence of spousal abuse will often be error. Recent, entirely commendable, public awareness of the wrongfulness of spousal abuse means that evidence of such acts may be extremely prejudicial.

constitutional proportions." [6] It helps preserve one of the most fundamental precepts of our system of criminal law: the requirement that criminal punishment be based on the commission of specific prohibited acts, not on the defendant's perceived bad character or tendency to commit crime.[7]

Unfortunately, prosecutors—with some encouragement from the courts [8]—are too often tempted to read the exceptions to this rule as the rule itself. As a result, what ought to be a narrow evaluation of the evidence relevant to particular incidents that took place at a particular moment in time is broadened into an examination of the defendant's lifestyle, habits and character. In effect, the defendant as criminal is on trial, not simply the defendant in relation to a specific crime. Although bad act evidence, when relevant for demonstrating, for example, motive, opportunity, or intent, is nonetheless inadmissible under Rule 403 of the Federal Rules of Evidence if the danger of unfair prejudice substantially outweighs its probative value, this is hardly a powerful safeguard. First, some unfair prejudicial effect is explicitly anticipated, even for evidence found admissible under Rule 403; only when the danger of unfair prejudice reaches an unacceptable level is the evidence barred, and prosecutors tend not to recognize when that level has been reached. Second, the weighing of prejudice versus probative value is inherently imprecise, for no matter how conscientious and careful the district court may be, it cannot calibrate its measurements to adjust for the unpredictable and subjective sensitivities of different jurors. Moreover, the exercise of discretion of district judges in this area is rarely overturned by the court of appeals. While these considerations are relevant for any Rule 403 evaluation, they are particularly salient with regard to bad act evidence, the prejudicial effect of which is a given, and the admission into evidence of which turns the focus of the trial from the crime to the criminal.

Whether it be misuse of the charging power or reliance on improper character evidence, the problem—and the solution—is essentially the same. Prosecutors know the utility of such abusive methods in winning a conviction; they need to be equally aware of the unfairness and the harm caused to our system of justice when convictions are won in this manner. Prosecutors must keep in mind that they are differently situated than defense counsel, whose responsibility to defend their clients means that within the limits of the law they should do their utmost to win a case. The prosecutor's client is the justice system. Accordingly, "[t]he duty of the prosecutor is to seek justice, not merely to convict." ABA Standards Relating to the Function of the Prosecutor 3–1.1(c).[9] Winning a conviction because of overcharging or presenting the jury with evidence of the defendant's extrinsic bad acts does not serve the ends of justice.[10]

Although we reverse Robertson's RICO conviction for the reasons explained in Judge Nelson's unanimous opinion for the court, the overwhelming evidence supporting his drug convictions necessitates a finding of harmless error with respect to some of the bad acts evidence and precludes us from reversing the district court's judgment on those counts. It should be emphasized, however, that in a closer case a full reversal might well have been warranted. Future prosecutors faced with similar circumstances would be well-

---

**6.** Fed.R.Evid. 404 notes of Advisory Committee on 1972 Proposed Rules at 228 (1993).

**7.** The constitutional status of this transaction-based model of criminal law is evident in *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). *See* Lynch, *supra* note 1, at 934.

**8.** *See Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).

**9.** As this court has recently found it necessary to remind prosecutors (*see United States v. Kojayan*, 8 F.3d 1315, 1324 (9th Cir.1993), the desire to win a conviction should never eclipse the more important responsibility of serving justice.

**10.** *See United States v. Jones*, 559 F.2d 960, 961 (5th Cir.), *reh'g denied*, 564 F.2d 98 (1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978): "It would be a miscarriage of justice if a defendant were found guilty of one offense simply because the jury felt he should be punished because of participation in other offenses for which he is not on trial."

advised to focus their attention more carefully on prosecuting the defendant under charges appropriate to his crimes, and on distinguishing legitimate substantive evidence from evidence of bad acts that serves principally to prejudice the jurors.