UNITED STATES of America, Appellee,

v.

Leo Darryl HARRINGTON, Appellant.

No. 96–3060.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 19, 1997.

Decided March 25, 1997.

Thomas G. Ross argued the cause and filed the brief for appellant.

Anne E. Pings, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, Washington, DC, were on the brief.

Before: WALD, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

*Dissenting opinion filed by Circuit Judge SENTELLE.*

WALD, Circuit Judge:

On December 21, 1995, a jury found Leo Darryl Harrington guilty of three criminal counts for his role in the armed robbery of a Roy Rogers restaurant on Georgia Avenue, N.W. in Washington, D.C. Harrington now challenges his conviction and sentencing on three grounds. First, he argues that the district court erred in denying his motion for a judgment of acquittal because the evidence was insufficient to prove beyond a reasonable doubt that the robbery had affected interstate commerce or that he had aided and abetted the use of a firearm during a crime of violence. Second, he claims that the district court's instructions on the Hobbs Act robbery count constituted plain error because they permitted the jury to return a guilty verdict on the basis of findings that are inadequate for a constitutional application of the statute. Lastly, Harrington alleges that the district court abused its discretion by permitting the jury to reach a verdict with eleven members, after a juror had been excused for good cause. We reject these challenges, and affirm Harrington's convictions and sentencing.

The court did not err in denying Harrington's motion for a judgment of acquittal because the evidence showing that the money lost and stolen as a result of the robbery would otherwise have been involved in interstate transactions was sufficient to support the conclusion that the robbery affected interstate commerce. Furthermore, evidence that Harrington helped his co-defendant Jimmie Lee Kennedy escape from the police and complete the robbery during which time Kennedy brandished a weapon and fired it at pursuing police officers was sufficient to support the conclusion that he had aided and abetted Kennedy's use of a firearm during and in relation to a crime of violence. The court's instruction to the jury on the Hobbs Act robbery count did not constitute plain error because the record of the trial as a whole indicates that the jury must have un-

derstood that it could not return a guilty verdict on the Hobbs Act robbery count unless it found that the Act's interstate commerce jurisdictional requirement was satisfied. Nor did the court abuse its discretion in allowing the jury to reach a verdict with eleven members after one had been excused for good cause, because Federal Rule of Criminal Procedure 23(b) expressly authorizes courts to permit eleven-member verdicts at their discretion, and no principle embodied in the rule, the Advisory Committee notes, any legal authority of which we are aware, or fundamental principles of fairness were violated by the court's exercise of this discretion in this case.

## I. BACKGROUND

Just after 7:00 on the morning of Sunday, June 25, 1995, Jimmie Lee Kennedy entered the Roy Rogers restaurant at 6514 Georgia Avenue, N.W. in Washington, D.C., jumped over the counter brandishing a handgun, and demanded that the manager give him the money from the restaurant's safe. After the manager gave him cash, including paper money and rolled coins, from the safe, Kennedy left the restaurant. As all this was happening inside the restaurant, two uniformed police officers happened to be waiting in a marked Metropolitan Police car to place an order at the restaurant's drive-through window. The officers noticed that Kennedy was clutching something and seemed startled when he saw the police car on his way out of the restaurant, so they left the drive-through line and followed him in the car. When Kennedy neared a house, one of the officers asked him if he lived there; Kennedy then drew his gun and bolted across the house's backyard, firing several shots back at the officers and slightly wounding one of them.

Meanwhile, Harrington was waiting for Kennedy one and a half blocks from the Roy Rogers in his Toyota 4–Runner, with the engine running. After Kennedy ran to the vehicle with his gun drawn and got in, still firing at the officer pursuing him, Harrington drove away. A high-speed chase through the neighborhood ensued, ending only after police forced Harrington's Toyota off the road and into a traffic signal pole; at that point,

Kennedy jumped out of the Toyota and pointed his gun at one of the officers, but another officer knocked him down with his car. Harrington jumped out of the crashed Toyota and fled, pursued by two police cars with their lights flashing. When one of the officers pointed a gun at him and ordered him to stop, Harrington was arrested.

A grand jury indicted Harrington on August 9, 1995, for aiding and abetting a robbery in violation of the Hobbs Act, 18 U.S.C. § 1951(a) and 2, aiding and abetting the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and 2, and resisting police officers in violation of D.C. CODE ANN. § 22–505(a). Harrington was tried before a jury between December 18 and December 21, 1995, and convicted on all counts. On April 12, 1996, the court sentenced Harrington to seventy-seven months in prison on the Hobbs Act robbery count, sixty months in prison on the § 924(c) firearm count, and between twenty months and sixty months in prison for resisting police officers; the sentences on the robbery and firearm counts to run consecutively to each other but concurrently with the sentence for resisting police officers.

## II. DISCUSSION

A. *The District Court's Denial of Defendant's Motion for a Judgment of Acquittal*

■ Harrington's first challenge in this appeal is to the district court's denial of the motion for a judgment of acquittal made at the close of the government's evidence. We review a trial court's denial of such a motion *de novo,* considering the evidence in the light most favorable to the government and determining whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Lucas,* 67 F.3d 956, 959 (D.C.Cir.1995). The defendant claims that the government's evidence

did not meet this standard with regard to two of the three counts of which he was convicted. We find that the government's evidence was sufficient to support the guilty verdicts, and thus the district court did not err in denying Harrington's motion for a judgment of acquittal.

1. *Sufficiency of the Evidence of an Effect on Interstate Commerce*

■ The first ground on which Harrington claims insufficiency of the government's evidence involves the charge of aiding and abetting a Hobbs Act robbery. Harrington alleges that the government failed to prove that the robbery was sufficiently connected to interstate commerce to justify the imposition against him of the federal commerce power. *See Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960) (noting that the Hobbs Act represents an exercise of the power enumerated in the Commerce Clause of the United States Constitution). The Hobbs Act makes it a federal crime to "obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce, by robbery or extortion," 18 U.S.C. § 1951(a), and defines "commerce" as "commerce within the District of Columbia,[1] or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

Although on brief Harrington asserted that under *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the government was required to show that the robbery had a "substantial" effect on interstate commerce to justify the application of the Hobbs Act, *see* Brief for Defendant–Appellant at 18, at oral argument he acknowledged his lack of authority for this proposition and focused instead on the ques-

---

**1.** The government acknowledges that it might have pled Hobbs Act jurisdiction based on Congress' plenary power over the District of Columbia, but does not seek affirmance on this rationale because the jury was not instructed in accordance with this jurisdictional theory. *See* Brief for Appellee at 21 n.12.

tion of whether the government had succeeded in showing more than a "merely speculative" connection between the robbery of the Roy Rogers restaurant and interstate commerce. *Id.*

■ We agree with the nearly unanimous judgment of those federal courts that have reviewed this type of challenge after *Lopez*, that the proper question for a court reviewing a claim that the evidence was insufficient to satisfy a federal statute's "jurisdictional element" [2] remains whether the evidence was sufficient to show an "explicit" and "concrete" effect on interstate commerce, *Lopez*, 514 U.S. at ——, ——, 115 S.Ct. at 1631, 1634, rather than a "substantial" one. *See, e.g., United States v. Atcheson*, 94 F.3d 1237, 1242 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1096, 137 L.Ed.2d 229 (1997); *United States v. Bolton*, 68 F.3d 396, 398 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Stillo*, 57 F.3d 553, 558 n. 2 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *United States v. Pettiford*, 934 F.Supp. 479, 482 (D.Mass. 1996); *United States v. Wong*, 1996 WL 225007, *6 (N.D.Cal.1996); *United States v. Arena*, 894 F.Supp. 580, 584–85 (N.D.N.Y. 1995); *see also United States v. Farmer*, 73 F.3d 836, 843 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996) (holding that *Lopez* "has no application to cases of commercial establishments," such as a Hy–Vee store that is part of an interstate chain of stores); *but see United States v. Woodruff*, 941 F.Supp. 910, 923 (N.D.Cal.1996) ("Given *Lopez* and [*United States v.*] *Pappadopoulos*, [64 F.3d 522 (9th Cir.1995) ], it appears that the de minim[i]s approach of the past to interstate commerce jurisdictional inquiries is no longer good law...").

The *Lopez* opinion itself, in its discussion of the central role that a jurisdictional element can play in the valid application of a federal criminal statute, clearly does not assume that a "substantial" effect on interstate commerce need be shown in such a setting. Indeed, the Court specifically suggested that a jurisdictional element could justify the application of the commerce power to a single firearm possession, despite the inevitable insubstantiality of such a one-time, small-scale event from the perspective of interstate commerce. *See Lopez*, 514 U.S. at ——, 115 S.Ct. at 1631 (noting that a jurisdictional element could "ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce"). And immediately after explicitly requiring a "substantial[ ]" effect on interstate commerce for regulation of purely *intra*state activities under the Commerce Clause generally, *Lopez*, 514 U.S. at ——, 115 S.Ct. at 1630, the Court was careful not to use the word "substantial" in describing the interstate nexus required to satisfy a statutory jurisdictional element. *See id.* at ——, 115 S.Ct. at 1631 ("[The Gun–Free School Zones Act] has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that ... have an explicit connection with or *effect* on interstate commerce.") (emphasis added).

Two other Commerce Clause cases decided by the Supreme Court in the same term as *Lopez* further support our conclusion that the "substantiality" requirement does not apply in the context of determining what quantum of evidence is required to satisfy statutory interstate commerce jurisdictional elements. Three and a half months before *Lopez*, in *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), the Court reversed the Alabama Supreme Court's holding that the connection between a termite-extermination contract and interstate commerce was too slight to

**2.** A "jurisdictional element" in a federal statute is a provision which requires a factual finding justifying the exercise of federal jurisdiction in connection with any individual application of the statute. In the *Lopez* case, which dealt with a federal statute regulating the possession of firearms, the Court noted the absence of any such statutory jurisdictional element which would "ensure, through case-by-case inquiry, that the

firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at ——, 115 S.Ct. at 1631. The *Lopez* Court offered as an example of such a provision the former statute making it a federal crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce ... any firearm." *Id.* (quoting *United States v. Bass*, 404 U.S. 336, 337, 92 S.Ct. 515, 517, 30 L.Ed.2d 488 (1971)).

justify the application of the Federal Arbitration Act, 9 U.S.C. § 2, which by its terms applied to any "contract evidencing a transaction involving commerce." *Id.* The Court dealt with the sufficiency of the evidence in support of this jurisdictional element in one paragraph, noting that "[i]n addition to the multistate nature of Terminix and Allied–Bruce, the termite-treating and house-repairing material used by Allied–Bruce in its ... efforts to carry out the terms of the [Termite Protection] Plan, came from outside Alabama." *Id.* at ——, 115 S.Ct. at 843. Five days after *Lopez,* the Supreme Court issued a terse *per curiam* decision in *United States v. Robertson,* 514 U.S. 669, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995), reversing a Ninth Circuit decision which in turn reversed a conviction under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Ninth Circuit had held that the government failed at trial to introduce sufficient evidence to prove that an Alaska gold mine, in which the defendant had invested the proceeds of his illegal drug transactions, was "engaged in or affect[ed] interstate commerce" as required by the statute's jurisdictional element. *Id.* at ——, 115 S.Ct. at 1732 (quoting *United States v. Robertson,* 15 F.3d 862, 868 (9th Cir.1994)). The Supreme Court thought it unnecessary even to "consider" the question of whether the activities of the gold mine "affected" interstate commerce, because the "affecting commerce" test is properly invoked only when the commerce power is being used to regulate "purely *intra*state commercial activities that nonetheless have substantial *inter*state effects," such as the activity of growing wheat at home for one's own consumption. *Id.* at ——, 115 S.Ct. at 1733 (citing *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). Thus, the RICO conviction was sound because the government had introduced sufficient evidence to satisfy the statute's jurisdictional element criminalizing the investment of racketeering proceeds in enterprises "engaged in" interstate commerce, and the Court expressly declared that in such situations it didn't matter whether the enterprise "substantially affect[ed]" interstate commerce. *Id.*

 As in these cases bracketing *Lopez,* the one we deal with here presents an interstate nexus that was demonstrated at trial pursuant to a statutory jurisdictional element. The evidence showed that the robbery interfered with a set of transactions that could by no stretch of the imagination be labeled "purely *intra*state," but rather constituted interstate commerce itself. *Robertson,* 514 U.S. at ——, 115 S.Ct. at 1733. Witness the specific transactions that the robbery interrupted: But for the robbery, at least several hundred dollars more cash would have been transported from the District of Columbia to Maryland for deposit in a Maryland bank, and much of this money would then have been used by the restaurant's North Carolina parent company to purchase food and beverages from Georgia, North Carolina, West Virginia, and Idaho for delivery to, and sale by, individual restaurants located in forty states. *See infra.* The Hobbs Act's jurisdictional element is specifically designed to guarantee that each prosecution is a separate, independent application of the commerce power to regulate—specifically, to protect[3]—interstate commerce *itself,* rather than some intrinsically local activity that must be found to "affect" interstate commerce. Thus the portions of Commerce Clause doctrine that are invoked to justify federal regulation of *intra*state activities which are *not* themselves interstate commerce are not directly on point. Even cases such as *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) and *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), which affirmed Congress' power to protect interstate commerce from the interference caused by the discriminatory practices of a business that served interstate travelers, *see Heart of Atlanta Motel,* 379 U.S. at 261, 85 S.Ct. at 359–60, and another that sold food purchased from other states, *see Katzenbach,*

---

**3.** "'To regulate,' in the sense intended [in the Commerce Clause], is to foster, protect, control, and restrain, with appropriate regard for the welfare of those who are immediately concerned and of the public at large." *Mondou v. New York, New Haven, & Hartford R.R. Co.,* 223 U.S. 1, 47, 32 S.Ct. 169, 174, 56 L.Ed. 327 (1912).

379 U.S. at 303, 85 S.Ct. at 383, are of a different genre, because unlike the Hobbs Act, the statute applied in those cases regulated entire categories of activity without any required showing of an interstate nexus in any individual case. *See Katzenbach,* 379 U.S. 294, 302–03, 85 S.Ct. 377, 382–384, 13 L.Ed.2d 290 (1964) ("The appellees contend that Congress has arbitrarily created a conclusive presumption that all restaurants meeting the criteria set out in the Act 'affect commerce.' Stated another way, they object to the omission of a provision for a case-by-case determination ... that racial discrimination in a particular restaurant affects commerce."). Like *Heart of Atlanta Motel* and *Katzenbach,* the *Lopez* decision is also different from the case at bar because in *Lopez* the Court reviewed Congress' attempt to regulate *all* possession of guns within 1,000 feet of schools without including a statutory jurisdictional element. The difference is critical because in order to adequately protect state police powers, Congress must ensure that a non-particularized regulation of a purely local activity is justified by the fact that the activity, individually or in the aggregate, has a "substantial" effect on interstate commerce. Otherwise, a few random instances of interstate effects could be used to justify regulation of a multitude of intrastate transactions with no interstate effects. In the case of a statute with a jurisdictional element, however, each case stands alone on its evidence that a concrete and specific effect does exist, and we can find no controlling authority suggesting that courts must require that, as to each factual scenario, a "substantial" rather than a "concrete" effect on interstate commerce be shown.

▪ Nonetheless *Lopez* reminds us that statutory jurisdictional elements must be taken seriously—in each case they must be satisfied by evidence showing an "explicit connection with or effect on interstate commerce." *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1631. Only in that way can these statutory provisions serve their intended purpose of protecting the *Lopez* Court's "first princi-

ples"—the limitation of Congress' powers to those enumerated in the Constitution, the division of authority between the state and federal governments, and the preservation of areas of traditional state sovereignty. *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1626. Thus even before *Lopez,* appellate courts had struck down convictions under the Hobbs Act where the government failed to present sufficient evidence to satisfy the jurisdictional elements, or offered only impermissibly attenuated connections between the activities underlying the convictions and interstate commerce. *See, e.g., United States v. Quigley,* 53 F.3d 909 (8th Cir.1995) (addressing an alleged interstate commerce nexus based on the claims that the defendants' robbery of two individuals had prevented the victims, who had been on their way to buy beer, from completing a transaction involving a commodity that had traveled in interstate commerce, and that the selection of the victims based on their membership in a group would discourage all members of that group from patronizing the store, and rejecting this interstate nexus because neither of these theories demonstrated a realistic probability of an actual effect on interstate commerce)[4]; *United States v. Collins,* 40 F.3d 95 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995) (addressing an alleged interstate commerce nexus based on the claims that the defendant's robbery of an individual's cash, jewelry, clothes, cellular telephone, and automobile had prevented the victim, an employee of a national computer company, from using the car to get to a business meeting and using the telephone to make business calls, and rejecting this interstate nexus because it was "too attenuated," and would make the Hobbs Act "ubiquitous"); *United States v. Buffey,* 899 F.2d 1402 (4th Cir.1990) (addressing an alleged interstate commerce nexus based on the claim that a conspiracy to extort a relatively small amount of money from a wealthy individual by threatening to release embarrassing tapes of the victim would have depleted the assets of the interstate company which the victim controlled, and rejecting this inter-

---

**4.** The Eighth Circuit decided *Quigley* the day after *Lopez,* but since it did not cite or refer to the *Lopez* opinion, we think it safe to assume that the *Quigley* court did not base its holding on *Lopez.*

state nexus because the victim would have paid the money out of his personal assets); *United States v. Mattson,* 671 F.2d 1020 (7th Cir.1982) (addressing an alleged interstate commerce nexus based on the claim that the defendant's payment of a bribe to a Democratic precinct captain, in exchange for which the precinct captain promised to help the defendant win a construction contract, affected interstate commerce in building materials or depleted the assets of the interstate company that owned the building, and rejecting this interstate nexus because the defendant paid the bribe out of his personal funds, and because the purchase of building materials from other states would occur regardless of whether the defendant's company were to obtain the contract). These pre-*Lopez* cases show that the jurisdictional element of the Hobbs Act has as much meat on its bones as any other element of a crime that juries must find beyond a reasonable doubt before they can return a guilty verdict. *See also Stirone,* 361 U.S. at 218, 80 S.Ct. at 273–74 ("Neither [element of a Hobbs Act crime] is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference."). Thus, to return a guilty verdict under a federal statute with a jurisdictional element, the jury must have had sufficient evidence to find that interstate commerce was obstructed, delayed, or affected without resorting to excessively strained inferences or guesswork.

We believe that in this case the jury had sufficient evidence to support its conclusion that the robbery in which Harrington participated "obstruct[ed], delay[ed], or affect[ed interstate] commerce" as required under the jurisdictional element of the Hobbs Act, 18 U.S.C. § 1951(a). We therefore reject Harrington's challenge based on the alleged insufficiency of the government's proof of an interstate nexus. In its opening statement, the government (sensitive to the possibility that the jury might find testimony about the interstate nexus less exciting than the testimony describing a high-speed chase and shootout), pronounced the essential nature of that nexus:

[I]ncidentally, [the case is] going to include some evidence that may not be too thrilling because there's one element of this Hobbs Act robbery that you should know about. It's robbery that interferes with interstate commerce.

So you're going to have to learn that the Roy Rogers restaurant operates in interstate commerce and that the robbery interfered with interstate commerce.... [T]hat is part of our burden of proof in this case.

Transcript ("Tr.") 12/18/95 at 27–28. At trial, the government called Sylvester Bradley, the restaurant's manager, who described how Harrington's partner had jumped over the counter and forced him to hand over money from the restaurant's safe. Bradley also testified that he closed the restaurant for three hours in order to protect his employees, ascertain how much money had been taken, and tell his employer about the robbery, that the shutdown occurred during a time when the restaurant was usually very busy, and that thirty two dollars was still missing after the police returned what they recovered from Harrington and Kennedy. Tr. 12/19/95 at 10–12. The government then called Jeffrey Wells, the district manager for Hardee's Food Systems ("Hardee's" or "the Company"), the North Carolina-based owner of the Roy Rogers restaurant. Wells testified that the restaurant's cash receipts are regularly picked up by an armored car and deposited in a bank in Maryland, and that Hardee's used the profit from this particular Roy Rogers restaurant, as well as others located in about forty states, to buy soda from Georgia and North Carolina, chicken from West Virginia, and french fries from Idaho. *Id.* at 29–30. The restaurant's plumbing, electrical, and equipment repair services are based in Maryland, and approximately forty percent of the restaurant's customers live in other states. *Id.* Finally, Wells testified that some of the money stolen from the victim Roy Rogers restaurant, as well as some of the receipts lost because of the three-hour shutdown (which he estimated at $800 to $1,100) would have been used to purchase food, beverages, and repair and maintenance services. *Id.* at 30, 33. The court instructed

the jury regarding the interstate nexus element of the Hobbs Act count as follows:

> The term "obstructs, delays or affects interstate commerce" means any action which in any manner or to any degree interferes with, changes or alters the movement or transportation or flow of goods, merchandise, money or other property in interstate commerce. It is not necessary for the government to show that the principal offender intended to specifically obstruct, delay or affect interstate commerce. All that is necessary as to this issue is that the government's evidence prove that the principal offender intended to commit an act forbidden by statute the natural consequences of which would be to obstruct, delay or affect commerce.

Tr. 12/20/95 at 101.

Armed with all this evidence, the jury certainly could find that the robbery affected interstate commerce without the sort of alchemy that led appellate courts to reverse Hobbs Act convictions in the cases just described. Without relying on disputed facts or dubious or speculative rationales, the jury could securely conclude that this robbery removed over thirty dollars from the restaurant's cash receipts and prevented another several hundred or a thousand dollars from coming in, and that this missing money would, in the first of a series of interstate transactions, definitely have been deposited in a Maryland bank; after that some of it would undoubtedly be used by the restaurant's North Carolina parent company to purchase supplies and services for the restaurant from Georgia, North Carolina, Maryland, West Virginia, and Idaho.

In *Stirone* the Supreme Court approved of the application of the Hobbs Act to a defendant who had extorted money from a concrete supplier, based on an interstate nexus quite similar to, although more hypothetical than, the one shown here. *See Stirone*, 361 U.S. at 214–15, 80 S.Ct. at 271–72. The Court noted that the victim of the extortion depended on shipments of sand from outside of the state and observed that if he had refused to pay the money illegally demanded, the victim's business would have been hindered, which in turn would have slowed or stopped the interstate shipments of sand. Thus, although in fact the victim's purchase of sand from outside the state had not been slowed or stopped, the Court held that "the trial jury was entitled to find that commerce was saved from such a blockage by [the victim's] compliance with [the defendant's] coercive and illegal demands"; such a finding was an adequate predicate for the application of the Hobbs Act, because "[i]t was to free commerce from such destructive burdens that the Hobbs Act was passed." *Id.* at 215, 80 S.Ct. at 272. *See also United States v. Robertson*, 514 U.S. 669, ——, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995) (holding that a jurisdictional element of RICO was satisfied by evidence showing that the defendant had invested the proceeds of illegal activity in an enterprise that was engaged in interstate commerce); *Allied Bruce–Terminix Co. v. Dobson*, 513 U.S. 265, ——, 115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995) (holding that the jurisdictional element of the Federal Arbitration Act was satisfied by multistate nature of the company that entered into a contract, and by that company's use of materials purchased from various states to complete its duties under the contract); *United States v. Green*, 350 U.S. 415, 420–21, 76 S.Ct. 522, 525–27, 100 L.Ed. 494 (1956) (rejecting as "clearly wrong" a lower court's holding that to apply the Hobbs Act to the extortion of money from an employer by his employees would extend the jurisdiction of federal courts and the power of Congress beyond their constitutional limits, and observing that the Hobbs Act was "directed at the protection of interstate commerce against injury from extortion").

We credit our dissenting colleague's concern that the Commerce Clause not be construed in such a way as to give the federal government a general police power that would extend even to purely local, non-commercial activities which have traditionally been the concern of the states; we conclude, however, that no such disruption of the federal balance is threatened by this application of the Hobbs Act to punish the obstruction of specific interstate transactions by robbery. We do not rest our holding on the understanding that the defendant was "engaged in

interstate commerce" when he participated in the robbery of the restaurant, *see* dissenting opinion at 1475; rather, we rely on the undisputed fact that the *restaurant* was engaged in interstate commerce, and we hold that the Hobbs Act was properly applied here to protect that commerce by punishing its obstruction and delay through robbery. *See Stirone,* 361 U.S. at 215, 80 S.Ct. at 272; *Mondou,* 223 U.S. at 47, 32 S.Ct. at 173–74. Nor do we rely on the proposition that this application of the Hobbs Act falls within the commerce power because the totality of all Hobbs Act robberies may, in the aggregate, affect (or "substantially" affect) interstate commerce. *See* dissenting opinion at 1475. Where the nexus between a federal statute and interstate commerce must be proved in each application of the statute, *Wickard*'s "aggregation" doctrine—which is designed to extend the commerce power to cases in which the evidence specific to each individual case may be insufficient to demonstrate the existence of an interstate nexus—is unnecessary. *See Robertson,* 514 U.S. at ——, 115 S.Ct. at 1733 (holding that *Wickard* was inapplicable to a case in which a federal statute with a jurisdictional element was applied to regulate *inter*state activities).

■ Acknowledging as well our colleague's insistence that an interstate nexus must not rely on connections between the regulated activity and interstate commerce that are "too attenuated," dissenting opinion at 1476 (quoting *Collins,* 40 F.3d at 99), we find that the evidence of an interstate nexus in this case clearly satisfies the requisite standard of proximity. In *Collins,* the Fifth Circuit struck down an application of the Hobbs Act against a robber who accosted an individual at the victim's private home, and stole the victim's personal property. *See id.* at 97–98. The interstate nexus was there held to be stretched too thin because it had to bridge the gap between robbery in an individual's private home and interstate commerce, based solely on the fact that the victim was employed by a company that engaged in some interstate transactions. By contrast, the

crime in which Harrington participated was robbery of a commercial entity which was *itself* engaged in interstate commerce. Even Judge Ebel's dissent in *United States v. Zeigler,* 19 F.3d 486 (10th Cir.1994), the prototype for our colleague's dissent, poses no evidentiary standard for an interstate nexus which cannot be satisfied in this case. *Cf.* dissenting opinion at 1476 (citing the *Zeigler* dissent). Judge Ebel argued that a *de minimis* depletion of a business' assets cannot by itself be assumed to affect interstate commerce simply because the business engaged in some interstate commerce. Here there was much more: The evidence showed that the robbery resulted in the removal of as much as $1,000 from an interstate bank transfer, and thereafter from a plethora of further interstate transactions, *see supra,* by causing the restaurant to lose irretrievably the receipts it would have taken in during the normally-busy three hour period during which it was closed.[5]

Because the jury had ample evidence from which to conclude that the robbery in which Harrington participated "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce" by removing and blocking cash receipts that would have been deposited in a Maryland bank and used in a number of other interstate transactions, we reject Harrington's challenge to the sufficiency of the evidence underlying the interstate nexus element of his Hobbs Act conviction.

2. *Sufficiency of the Evidence that Harrington Aided and Abetted the Use of a Firearm*

■ Harrington's next challenge to the sufficiency of the evidence relates to his conviction for aiding and abetting his partner Kennedy in the use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2. Harrington points out that he was sitting in his vehicle while Kennedy was inside the restaurant, and asserts that he did not and could not

---

**5.** We note, however, that the Hobbs Act does not restrict itself to the "obstruct[ion]" of interstate commerce, but applies as well to robberies that "delay[]" or "affect[]" commerce; thus, the

Hobbs Act would apply to a robbery that changed the *timing* of an interstate commercial transaction. *Cf.* dissenting opinion at 1476.

know that Kennedy would "actively employ" his weapon in the course of the robbery. He argues that the most the jury could infer from the evidence was that he knew Kennedy carried the weapon to "embolden" himself, an insufficient predicate for the application of section 924(c) under the Supreme Court's decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). We will sustain a conviction for aiding and abetting a principal's carrying or use of a firearm under section 924(c) only if the jury was presented with evidence showing that the defendant "kn[ew] to a practical certainty" that the principal would "use" a weapon in the ways prohibited by section 924(c). *United States v. Powell,* 929 F.2d 724, 728 (D.C.Cir.1991).

 We need not reach the question of precisely what the jury could conclude about Harrington's knowledge of Kennedy's intended use of the gun while in the restaurant, because the robbery did not end when Kennedy left the restaurant. The Hobbs Act prohibits the obstruction, delay, or affecting of commerce by "robbery" without specifying precisely when an individual robbery should be considered complete, and therefore we look to the common law of robbery to answer this question. *See Evans v. United States,* 504 U.S. 255, 259–60, 112 S.Ct. 1881, 1884–85, 119 L.Ed.2d 57 (1992). According to the common law, a robbery has not been completed as long as the robber in the immediate aftermath of taking the property indicates by his actions that he is not satisfied with the location of the stolen property. *See, e.g., United States v. Barlow,* 470 F.2d 1245, 1253 (D.C.Cir.1972); *Williams v. United States,* 478 A.2d 1101, 1105 (D.C.1984) (citing *Barlow* ); 77 C.J.S. *Robbery* § 2 (1994). In this case, Kennedy continued to be unsatisfied with the location of the stolen money up to the moment of his arrest, as manifested by his attempt to reach a getaway car and transport himself and the stolen money to a safe place.

Because there can be no doubt that Harrington aided and abetted his partner—by waiting for him near the restaurant in the vehicle, then taking the wheel in a high-speed effort to escape the police and thereby com-

plete the robbery, and did all this after he saw Kennedy firing his gun at pursuing police officers—we reject his claim that the jury had insufficient evidence to find him guilty of aiding and abetting his partner in the use of a weapon during a crime of violence.

### B. *The Court's Instructions to the Jury*

 Harrington raises several claims that the court's instructions to the jury were inadequate. Because he raises these challenges for the first time on appeal, we review the jury instructions for "plain error," FED. R.CRIM. P. 52(b), meaning that we will reverse the convictions on this ground only if they contained clear or obvious error that affected the outcome of the trial. *See United States v. Clarke,* 24 F.3d 257, 262 (D.C.Cir. 1994). In determining whether a jury instruction was plainly erroneous, we consider "the evidence adduced at trial, the arguments of counsel, and the content of the entire jury instruction." *United States v. Sayan,* 968 F.2d 55, 60 (D.C.Cir.1992) (quoting *United States v. Chan Chun–Yin,* 958 F.2d 440, 444 (D.C.Cir.1992) (citing *United States v. Whoie,* 925 F.2d 1481, 1485 (D.C.Cir.1991))).

 Harrington's first challenge to the jury instructions once again focuses on the interstate nexus element of the Hobbs Act count. He complains that the court did not give the jury a definition of "interstate commerce" or explain adequately the connection between the robbery and interstate commerce, and thereby permitted the jury to return a guilty verdict without finding that the robbery had the "substantial" effect on interstate commerce mandated by the Supreme Court in *Lopez.* We have already established that a concrete, even if less than "substantial," effect on interstate commerce is a sufficient jurisdictional predicate under the Hobbs Act, *see supra* Part II.A.1., and we reject the third prong of Harrington's challenge to the jury instructions on this basis. With regard to the other two, the record indicates that the jury was clearly instructed not to return a guilty verdict on the Hobbs Act count unless it could find that the robbery actually affected interstate commerce, and the testimony describing the res-

taurant's pattern of interstate transactions elucidated the meaning of this concept. The jury first heard the government say that "part of [its] burden of proof" was to show that the robbery interfered with interstate commerce, Tr. 12/18/95 at 27–28, then heard a witness testify regarding the transactions for which the restaurant's foregone and stolen cash receipts would have been used, and finally was instructed by the court that the fourth essential element of the Hobbs Act count was that "the robbery obstructed, delayed or affected interstate commerce." Tr. 12/20/95 at 99–100.

Harrington argues that the court instructed the jury to consider as a Hobbs Act predicate Kennedy's robbery of the restaurant's manager, rather than of the restaurant itself. He first asserts that this is yet another reason to find the interstate commerce element unsatisfied, because the jury had no evidence connecting the robbery of this individual to interstate commerce. Then he claims that this focus on the robbery of an individual varied from, or constructively amended, the indictment, depriving him of his rights to due process and to a fair trial. We reject these challenges because, although in setting out the elements of the Hobbs Act count the court did refer to the principal offender having "obtained property from Sylvester Bradley," Tr. 12/20/95 at 99–100, it was abundantly clear that the money, which took the form of bills and coin rolls kept in the restaurant's safe to make change for customers (as the manager's testimony indicated), was not the personal property of the restaurant's manager, and therefore it was not plain error to decline to instruct the jury against making this unlikely inference.

In sum, we find that the instructions contained no "plain error"; the record as a whole shows that the jury must clearly have understood its duty to determine whether Harrington participated in the robbery of a Roy Rogers restaurant, and whether this robbery affected interstate commerce.

C. *The Court's Decision to Permit an Eleven–Member Jury to Render a Verdict*

Finally, Harrington claims that the court abused its discretion by allowing the jury to render a verdict with eleven members after a juror had been excused for just cause; he does not challenge the court's decision to excuse the juror, but argues that the court should then have declared a mistrial rather than permitting an eleven-member verdict. Under Federal Rule of Criminal Procedure 23(b), "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors." FED. R.CRIM.P. 23(b). We reject Harrington's challenge because his arguments take him only so far as to demonstrate that the judge would have been within his discretion in declaring a mistrial; he cannot go the final mile to show that not to do so was an abuse of discretion. Rule 23(b) explicitly and without reservation assigns the stop/go decision to the discretion of the trial court, and nothing in the accompanying Advisory Committee notes, or in any case of which we are aware, cabins this discretion in a way that would call this judge's decision into question. Harrington's argument that his trial was a relatively short and simple one is well taken, but the Advisory Committee notes say only that in such cases, a trial court "might well" decide that a mistrial is appropriate, while for longer and more complex trials courts would be "more likely" to decide against a mistrial. *Id.* advisory committee's note. Because Rule 23(b) expressly leaves this decision in the trial court's discretion, and because we find no policy statement, case, or principle of fairness that would invalidate the discretionary decision made by the trial court here, Harrington's challenge to the eleven-member jury verdict fails.

## III. CONCLUSION

The jury that convicted Harrington had sufficient evidence to find that the robbery in which Harrington participated interfered with interstate commerce as required under the Hobbs Act, 18 U.S.C. § 1951(a), and that Harrington aided and abetted his partner's use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). The jury was properly instructed with regard to the Hobbs Act count, and the

trial court did not abuse its discretion by permitting the jury to reach a verdict with eleven members after one had been excused for just cause. Accordingly, Harrington's convictions are

*Affirmed.*

SENTELLE, Circuit Judge, dissenting:

I recognize that the way in which the court's opinion construes and applies the Hobbs Act to this unremarkable local robbery is consistent with the few cases that have dealt with similar questions. I further recognize that the construction and application by other courts and now by this one is consistent with the language of 18 U.S.C. § 1951(a). I dissent because in my view that construction and application raises such drastic constitutional implications as to warrant a more restricted definition of the interstate commerce element of that statute. I would therefore reverse appellant's conviction, based on the district court's denial of defendant's motion for a judgment of acquittal.

A. *The Statute*

The language of the Hobbs Act robbery statute is quite sweeping:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion ... shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). "Commerce" is defined in broad terms as including "all commerce between any point in a State, Territory, Possession, or the District of Columbia, and any point outside thereof. ..." *Id.* § 1951(b)(3). As the majority notes, the commerce definition also includes "commerce within the District of Columbia." *Id.* However, because the government did not rely on that section at trial, or in its appellate arguments, and especially because the jury was instructed on the interstate commerce theory and therefore never had a chance to pass on defendant's guilt under a theory based on Congress's plenary power over the District, the majority rightly sets aside that possible basis for affirmance. Maj. Op. at 1464, n.1. Instead, the federal power claimed by the in-

dicting decision of the United States extends virtually plenary power to events in the several states.

As this case illustrates, under the theory of the prosecution, there is no armed robbery of a commercial victim not covered by the Hobbs Act. There is no corner grocery in Kansas that does not stock orange juice from Florida or California; none in Florida or California that does not stock salt from some other state. Under the government's theory of this case, Congress, in passing the Hobbs Act, intended to federalize the robbery of every Mom and Pop restaurant that buys coffee, spices, or fruit from out of state. That is all of them.

It strikes me as a most odd result that Congress would have gone to the trouble of including a separate clause covering "commerce within the District of Columbia" when it was just about to cover all commerce everywhere in the next few clauses. I am tempted to say that this odd result is sufficient to lead me to a different construction, based on the theory that "absurd results which follow from giving ... broad meaning to the words [of a statute], make it unreasonable to believe that the legislator intended to include" that breadth. *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 2566–67, 105 L.Ed.2d 377 (1989) (quoting *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)). However, as Justice Kennedy pointed out in *Public Citizen,* the *Holy Trinity* exception invoked by the majority in that case is "a legitimate tool of the judiciary ... only as long as the Court acts with self-discipline by limiting the exception to situations where the result of applying the plain language would be, in a genuine sense, absurd," *id.* at 470, 109 S.Ct. at 2575 (Kennedy, J., concurring), that is, where it is impossible to conceive "that Congress could have intended the result," *id.* at 471, 109 S.Ct. at 2575 (Kennedy, J., concurring). Otherwise, the court runs the risk of imposing its own will instead of a judgment. This is not such a case. The statute says what it says, and I must presume that it means what it says.

More tempting still is the " 'cardinal principle,' " invoked in *Public Citizen*, that where " 'a serious doubt of constitutionality is raised, ... th[e] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " 491 U.S. at 465–66, 109 S.Ct. at 2572–73 (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296–97, 76 L.Ed. 598 (1932)). I would invoke that cardinal principle in this case because I think the interpretation urged by the United States and adopted by a majority both of this panel and other circuits raises a serious doubt as to the constitutionality of the Act, at least as applied here.

### B. *The Jury Instruction*

Although appellant asserts that the district court erred in instructing the jury on the element of interstate commerce, he did not raise this objection in the trial court. Therefore, for appellant to prevail on appeal, the alleged error must be "plain" in the sense that it must be clear or obvious, and even then it will require reversal only if it affected the outcome of the trial. *United States v. Gatling*, 96 F.3d 1511, 1524–25 (D.C.Cir. 1996). As the district court's instructions in this case are consistent with authoritative decisions of other circuits, and as we have never passed on the question, I would be unable to conclude, even were I writing for the majority, that any error in instruction met that exacting standard. *See, e.g., United States v. Atcheson*, 94 F.3d 1237 (9th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1096, 137 L.Ed.2d 229 (1997); *United States v. Farmer*, 73 F.3d 836 (8th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996); *United States v. Bolton*, 68 F.3d 396 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Stillo*, 57 F.3d 553 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *United States v. Zeigler*, 19 F.3d 486 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 517, 130 L.Ed.2d 422 (1994). However, I do not mean to imply that I approve of the instructions given by the district court. Rather, for the reasons set forth in the next section of this dissent, I would require instructions consistent with the more demanding evidentiary standard which I believe should be properly applied in this and other Hobbs Act robbery cases.

### C. *Sufficiency of the Evidence*

The district court, a majority of this panel, and the few other circuits that have passed on the question have concluded that the *de minimis* connection to interstate commerce of the otherwise local robbery of a retail establishment is sufficient to allow the Hobbs Act constitutionally to apply. I disagree.

There are, as the majority and I have both noted, few cases construing the Hobbs Act in this context. I speculate that it is because few United States attorneys have ever been of the bold and aggressive view that Congress intended to put them in the business of prosecuting what would normally be a mainstay of the docket of the local district attorney—a consideration perhaps of less moment in the District of Columbia, where a single official serves as both the federal and local prosecutor, but still of relevance in choosing the court in which the case is brought and therefore of the statute under which it is said to lie. However, the Hobbs Act covers not only robbery but extortion, and the same question has arisen there. In that context, one circuit noted that "the nexus between the extortionate conduct and interstate commerce may be *de minimis* but it must nonetheless exist." *United States v. Lotspeich*, 796 F.2d 1268, 1270 (10th Cir.1986). Furthermore, there is authority that holds, quite sensibly, that this section places robbery and extortion on equal ground regarding the jurisdictional requirement of affecting commerce. *United States v. Jarrett*, 705 F.2d 198, 201 (7th Cir.1983), *cert. denied*, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984). In considering what the interstate commerce element of the extortionate prohibition of the Hobbs Act requires, one circuit, taking the wording of the Act in light of its legislative history, concluded that despite the breadth of the statutory phrase " '[w]hoever in any way or degree obstructs, delays, or affects commerce ... by extortion,' " Congress actually "intended to protect the free flow of commerce and prevent exaction of any unlawful tribute from interstate commerce" and had

no "intent whatsoever to punish activity absent some adverse effect on interstate commerce." *United States v. French,* 628 F.2d 1069, 1075–76 (8th Cir.) (citation omitted), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

I think it dangerous, to the point of the constitutional peril of crossing the legitimate bounds of separation of powers concepts, to depart from the literal wording of the statute based on a court's conception of what the legislative history might indicate. Nonetheless, I am willing to tread that perilous path where a literal but broad reading of a statute would raise serious constitutional questions and a narrower construction would avoid that constitutional difficulty. *Cf. Crowell v. Benson,* 285 U.S. at 62, 52 S.Ct. at 296–97.

The constitutional question raised by the breadth of the prosecution's interpretation of the commerce clause by the present application of the Hobbs Act is illustrated by *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In that case, the Supreme Court declared that it would not construe the commerce clause so as to convert constitutional "congressional authority ... to a general police power of the sort retained by the States." *Id.* at ——, 115 S.Ct. at 1634. Rather, the Court concluded that "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce." *Id.* at ——, 115 S.Ct. at 1629–30 (citation omitted). That interpretation of the commerce clause is itself a fairly broad one. What the commerce clause actually says is that "Congress shall have Power ... To regulate Commerce ... among the several States." U.S. CONST. art. I, § 8, cl. 3. Nonetheless, under the commerce clause, as authoritatively construed by the Supreme Court in *Lopez,* Congress has the power to regulate commerce and, by derivative inclusion, "activities that substantially affect interstate commerce." 514 U.S. at ——, 115 S.Ct. at 1630. Harrington, by robbing a store, was not engaged in interstate commerce. I would submit that he did not by robbing a local retail outlet—even one connected with an interstate chain—substantially affect interstate commerce.

I concede, as other circuits have noted, that *Lopez* further states that "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1629 (internal quotations omitted), relied upon in *United States v. Boyd,* 1997 WL 86027, at *1 (4th Cir.1997) (unpublished opinion); *United States v. Leslie,* 103 F.3d 1093, 1100 (2nd Cir.1997); *Atcheson,* 94 F.3d at 1241; *Farmer,* 73 F.3d at 843; *Bolton,* 68 F.3d at 399; and *Stillo,* 57 F.3d at 558 n. 2. However, I find this language insufficient to support the government's broad interpretation of the congressional power under the commerce clause to extend the Hobbs Act to this case.

First, I note that the quoted language from *Lopez* is itself a quote from *Maryland v. Wirtz,* 392 U.S. 183, 187 n. 7, 88 S.Ct. 2017, 2019 n. 7, 20 L.Ed.2d 1020 (1968), and follows other language quoted from *Wirtz* to the effect that " '[n]either here nor in *Wickard* [*v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)] has the Court declared that Congress may use a relatively trivial effect on commerce as an excuse for broad general regulation of state or private activities.' " *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1629 (quoting *Wirtz,* 392 U.S. at 196 n. 27, 88 S.Ct. at 2024 n. 27). I think it likely from Congress's inclusion of plenary regulation of District of Columbia commerce in the Hobbs Act robbery section that Congress did not see itself as making a similar plenary inclusion of the commerce among the states. Rather, it intended to act only to the extent of its power to regulate interstate commerce. An isolated robbery of an isolated retail outlet is not interstate commerce, nor has the government shown it to have a substantial effect on that commerce.

I understand the argument that the *Lopez* language first quoted above could be taken as supporting the proposition that all such potential Hobbs Act robberies should be aggregated so that the *de minimis* effect of each one "is of no consequence." Taken in the light of the further quotation, however, I

do not think that is what the *Lopez* Court meant. Congress did not undertake a general regulatory scheme of armed robberies. That the Hobbs Act itself can remain constitutional despite *de minimis* effects of an individual application does not answer the question of whether a robbery having no more than a *de minimis* effect is or constitutionally can be covered. Therefore, rather than relying on the first *Lopez* quote to sustain the constitutionality of this attempted application, I would look to the second quote and hold that this "relatively trivial effect [if any] on commerce" should not be used as an excuse for the broad federalization of an otherwise state-governed crime.

I would further say that in concluding that we should interpret the Hobbs Act less broadly than the government argues, I am instructed by the separate opinions of Supreme Court Justices in *Lopez*. First, Justice Kennedy, joined by Justice O'Connor, expressed his concern about exercises of federal power where "neither the actors nor their conduct have a commercial character" at least in part because "any conduct in this interdependent world of ours has an ultimate commercial origin or consequence. . . ." 514 U.S. at ——, 115 S.Ct. at 1640 (Kennedy, J., concurring). In his view, "if Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern." *Id.* (Kennedy, J., concurring). As essentially local robbery is a noncommercial activity of a traditional state concern, *id.* at ——, 115 S.Ct. at 1654 (Souter, J., dissenting), I read the opinion commanding the allegiance of Justices Kennedy and O'Connor as suggesting even more strongly than the majority opinion written by Chief Justice Rehnquist that applications of the federal criminal law to activity which is not commerce and which does not substantially affect interstate commerce are at the very least constitutionally suspect.

Justice Thomas spoke still more strongly. Noting that the language of the commerce clause empowers Congress only to regulate "Commerce . . . among the several states," and that the "substantial effects" test is a court-made device which "taken to its logical extreme, would give Congress a police power over all aspects of American life," 514 U.S. at ——, 115 S.Ct. at 1642 (Thomas, J., concurring) (internal quotations omitted), he believed that the Court "must further reconsider" the substantial effects test.

The Supreme Court's majority opinion in *Lopez*, especially in light of the concurring language of three justices, leads me to believe that the United States' broad interpretation of the Hobbs Act robbery statute is directing us toward constitutionally dangerous ground. I therefore would construe the clause more narrowly, as did Judge Ebel in his dissent from *United States v. Zeigler*, *supra*. As he noted there, "[a] *de minimis* depletion of the assets of a business engaged in interstate commerce does not necessarily support a conclusion that interstate commerce has been affected," 19 F.3d at 496 (Ebel, J., dissenting), let alone that it has been substantially affected. While the bank deposit of the restaurant in this case may have been lighter on the day of the robbery, there is no proof in the record from which a finder of fact could conclude that any fewer goods or loss of payment actually moved in interstate commerce than would otherwise have been the case, or that the acts of this defendant in any other way substantially affected interstate commerce. The evidence really does not support the proposition, nor could one really believe that any less interstate commerce actually occurred. No one testified that Roy Rogers or its parent company really passed less money or fewer goods in commerce than would have been the case but for this robbery—at most, the timing of one money transfer was changed. That being the case, I would hold that the district court should have allowed the defense motion for judgment as a matter of law at the close of the prosecution's evidence.

CONCLUSION

Dissenters customarily, and I hope generally sincerely, declare that they are "respectfully" dissenting. My dissent today is especially respectful. I recognize in dissent that the district court and the majority of this panel are in accord with the majority of judges who have considered the question—

indeed, there is unanimity among such judges but for Judge Ebel and myself. Nonetheless, I think that interpretation wrong, in part for a reason suggested by an authority cited in the majority's opinion. In *United States v. Collins,* 40 F.3d 95, 99–101 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995), one circuit declared that the robbery of an individual's cash, jewelry, clothes, cellular telephone, and automobile, by preventing the victim, an employee of a national company, from attending a business meeting and using his telephone to make business calls, had provided an interstate nexus "too attenuated" to support federal jurisdiction, and that reliance upon such a nexus would make the Hobbs Act "ubiquitous." *See* Maj. Op. at 1467. In my view, the connection in the present case is equally attenuated, and, given the obvious fact that virtually every retail outlet of any kind deals in goods obtained in interstate commerce, this precedent also has the potential to make the Hobbs Act ubiquitous. Therefore, I dissent from the majority's conclusion affirming the district court—although I do so most respectfully.