BERYL A. HOWELL, Chief Judge
The defendant, Erwin Pernell Pettaway, was arrested after telling a Secret Service agent stationed outside the White House that he had explosives on his person, and indicted on one count of threatening and *141 conveying false information concerning the use of an explosive, in violation of 18 U.S.C. § 844(e), the federal bomb threat statute. See Crim. Compl., Attach. 1, Aff. of Aaron Adelsperger, U.S. Secret Serv. Unif. Div. Officer ("U.S.S.S. Aff.") ¶¶ 4-7, ECF No. 1-1; Indictment, ECF No. 4. The defendant has moved to dismiss the indictment, under Federal Rule of Criminal Procedure 12(b), asserting that the government has not stated a cognizable offense. He argues that § 844(e), as applied to his conduct, (1) exceeds Congress's authority under the Commerce Clause, and (2) criminalizes speech protected by the First Amendment. He also claims the government cannot satisfy § 844(e)'s mens rea requirement of either willful or malicious and knowing conduct. Issues of fact exist as to whether the defendant's conduct falls within Congress's reach and whether the defendant acted with the requisite intent under § 844(e) for criminal liability to attach. For these reasons, the defendant's motion to dismiss is denied.
I. BACKGROUND
As proffered by the government, the basic facts underlying the defendant's charge are summarized as follows. On November 3, 2017, at roughly 9:10 a.m., the defendant, still wearing a medical identification bracelet from his discharge that morning from George Washington University Hospital, approached the White House, 1600 Pennsylvania Avenue, NW, Washington, D.C. U.S.S.S. Aff. ¶ 5; Def.'s Mot. Dismiss ("Def.'s Mot.") at 1, ECF No. 14; Mem. Findings Fact & Stmt. Reasons Supp. Order Pretrial Detention at 3-4, ECF No. 10; Gov't's Notice Filing, Ex. A, Rule 16(a) Letter, ECF No. 12-1. Amidst tourists and in front of a U.S. Secret Service law enforcement officer, the defendant announced, unprovoked, words to the effect: "I have explosives on me." U.S.S.S. Aff. ¶ 5. The defendant repeated the phrase at the officer's request. Id. The officer ordered tourists from the area and instructed the defendant to lay on the ground, while the defendant continued to emphasize that he had explosives on his person. Id. As further U.S.S.S. personnel arrived on the scene, the defendant repeatedly said that explosives were in his body and "under his arms," and that he had "laid down his cell phone because it was the trigger." Id. Officers found a cell phone near the defendant, who was still laying on the ground, and investigated the phone as a suspicious package. Id. The officers also inspected the defendant's person but found no suspicious items. Id.
The President had vacated the White House at approximately 9:00 a.m., minutes before the defendant had approached the building. Id. ¶ 6. Due to the defendant's conduct, law enforcement personnel closed large areas immediately surrounding the White House, while other nearby areas that had already been temporarily closed to facilitate the President's departure remained closed. Id. Areas affected by the defendant's conduct included the White House grounds, Lafayette Park, and an area bounded by 15th Street Northwest, Pennsylvania Avenue NW, and 17th Street Northwest. Id.
As a result of the security measures that the defendant's conduct prompted, entrances to nearby parks, museums and government buildings-including the Renwick Art Gallery, the historic Decatur House Museum, the U.S. Department of the Treasury, the Treasury Annex, the Blair House, and the White House Conference Center-were closed for roughly 90 minutes. Id. In addition, White House tours were interrupted for roughly 30 minutes, and construction by two private companies underway in Lafayette Park ceased for roughly 90 minutes. Id. The closures delayed the Vice-President, who was scheduled to arrive to the White House by *142 motorcade shortly thereafter. Id. By 10:38 a.m., personnel from the Metropolitan Police Department's Explosives Ordinance Disposal team, D.C. Fire and EMS, and U.S. Park Police cleared the area and re-opened access to streets, parks, and nearby buildings. Id.
The defendant was relocated to another area for further investigation, where he continued to maintain that he possessed explosives. Id. ¶ 5. The defendant consented to an interview with law enforcement personnel, during which he reportedly experienced auditory hallucinations, carrying on a conversation with a "Detective Reeves," who was not present. Id. ¶ 7. During questioning, the defendant seemed to consult the imaginary Detective Reeves, and responded to questioning with answers he indicated the imaginary detective had given him. Id. The defendant told the officers that he had no intention to harm the President, but that "Detective Reeves" had advised the defendant to go to the White House, as "it was the safest place for him to be," and that individuals who "were trying to kill him" had placed a bomb in the defendant's phone. Id.
As noted, the defendant was indicted on one count of threatening and conveying false information concerning the use of an explosive, in violation of 18 U.S.C. § 844(e). See Indictment. His counsel has indicated during several court appearances that the defendant is competent and able to assist in his defense. See Order Denying Gov't's Request for Competency Evaluation at 2-3, ECF No. 7 (recounting defense counsel's repeated assertions of defendant's competency); Hr'g Tr. (Feb. 23, 2018).[1] Briefing and oral argument on the defendant's pending motion to dismiss the indictment as legally inadequate, under Rule 12(b), are now complete. See Def.'s Mot.; Gov't Resp. Def.'s Mot. ("Gov't's Opp'n"), ECF No. 16; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply"), ECF No. 17.
II. LEGAL STANDARD
"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). "The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits: ... a defect in the indictment ... including ... failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B)(v). The D.C. Circuit has explained that "[b]ecause a court's 'use of its supervisory power to dismiss an indictment ... directly encroaches upon the fundamental role of the grand jury,' dismissal is granted only in unusual circumstances." United States v. Ballestas , 795 F.3d 138, 148 (D.C.Cir. 2015) (alterations omitted) (quoting Whitehouse v. U.S. Dist. Court , 53 F.3d 1349, 1360 (1st Cir. 1995) ). In resolving a motion to dismiss an indictment, the truth of the factual allegations proffered by the government may be assumed. Id. at 149.
"[I]t is an unusual circumstance for the district court to resolve the sufficiency of the evidence before trial because the government is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure." United States v. Yakou , 428 F.3d 241, 247 (D.C. Cir. 2005) (alterations and internal quotation marks omitted). A "trial on the merits" is necessary when a dispute exists as to the sufficiency of "evidence relevant to the question *143 of guilt or innocence." Id. at 246 (quoting United States v. Ayarza-Garcia , 819 F.2d 1043, 1048 (11th Cir. 1987) ); see also United States v. Knox , 396 U.S. 77, 83 & n.7, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) (finding that defendant's arguments regarding a duress defense and "whether his false statement was made 'willfully' ... must be determined initially at his trial" since "evidentiary questions of this type should not be determined on such a motion" under Rule 12(b)(1) ).[2]
III. DISCUSSION
The defendant argues that the indictment exceeds the scope of Congress's authority under the Commerce Clause, burdens speech the First Amendment protects, and fails to allege the requisite mens rea under § 844(e) to establish criminal liability. Each of these challenges are addressed seriatim below.
A. Defendant's Commerce Clause Challenge
The defendant contends that Congress's power does not reach the defendant's conduct, an issue that turns on whether that conduct affected interstate commerce or properly may be regulated pursuant to Congress's power over the District of Columbia. Triable issues of fact exist as to this issue, making dismissal on this ground inappropriate at this pre-trial stage.
1. The Scope of Congress's Commerce Clause Authority
The Constitution empowers Congress "[t]o regulate commerce ... among the several states." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power[:]" (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "those activities having a substantial relation to interstate commerce" despite being themselves wholly intrastate, "i.e. , those [intrastate] activities that substantially affect interstate commerce." United States v. Lopez , 514 U.S. 549, 558-59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The Supreme Court also has recognized, however, that Congress lawfully may regulate conduct that has a "connection with or effect on interstate commerce" that is merely "explicit" rather than "substantial," where a statute contains an "express jurisdictional element which might limit its reach" to such conduct. Id. at 561-62, 115 S.Ct. 1624. Indeed, the Lopez Court emphasized that the criminal statute there held unconstitutional "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the [conduct] in question affects interstate commerce." Id. at 561, 115 S.Ct. 1624 ; see also United States v. Morrison , 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (" Lopez makes clear that such a jurisdictional element would lend support to the argument that [a statute] is sufficiently tied to interstate commerce.").
In determining whether charged conduct satisfies Lopez 's third category, a *144 court addresses two threshold questions. First, how strong an impact on interstate commerce must the activity have? The D.C. Circuit held, in Lopez 's wake, that the magnitude of charged conduct's impact on interstate commerce needed to sustain a federal criminal statute's application turns on whether the statute contains a jurisdictional element. United States v. Harrington , 108 F.3d 1460, 1467 (D.C. Cir. 1997). In charging conduct under a statute lacking a jurisdictional element, the government must show that the conduct had a "substantial" impact on interstate commerce. Id. at 1467. Such a strong showing is required to prevent Congress from using "a few random instances of interstate effects ... to justify regulation of a multitude of intrastate transactions with no interstate effects." Id. By contrast, in charging conduct under a statute containing a jurisdictional element, the government need show only that such conduct had a "concrete" impact on interstate commerce. Id. This lesser showing is appropriate because jurisdictional elements "guarantee that each prosecution is a separate, independent application of the commerce power to regulate-specifically, to protect-interstate commerce itself, rather than some intrinsically local activity that must be found to 'affect' interstate commerce," meaning that "each case stands alone on its evidence that a concrete and specific effect does exist." Id. at 1466-67 (citation omitted). Thus, a "substantial" effects on interstate commerce is needed only when Congress enacts "a non-particularized"-i.e. , jurisdictionally unlimited-"regulation of a purely local activity." Id.[3] This rule accords with Lopez , which framed the relevant inquiry, in reviewing a prosecution under a statute containing a jurisdictional element, as whether "the [conduct] in question affects interstate commerce"-not whether such conduct "substantially affects interstate commerce"-and instructed that such inquiry occur "on a case-by-case basis." 514 U.S. at 561, 115 S.Ct. 1624 (emphasis added).
The second question a court addresses in determining whether charged conduct satisfies Lopez 's third category is the level of generality at which to define the effect on interstate commerce. Whether the government must show that the defendant's charged conduct itself affected interstate commerce or merely that such conduct generally affects interstate commerce in the aggregate, turns on whether the conduct was economic in nature. Congress may regulate economic conduct that affects interstate commerce only "trivial[ly] by itself" if such conduct's aggregate effect on interstate commerce "is far from trivial." Wickard v. Filburn , 317 U.S. 111, 127-28, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ;
*145 see also Nat'l Fed'n of Indep. Bus. v. Sebelius , 567 U.S. 519, 537, 549, 551-53, 557, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (discussing Wickard without questioning that it remains good law); United States v. Morrison , 529 U.S. 598, 610, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (same); id. at 628, 120 S.Ct. 1740 (Souter, J., dissenting) (observing that Wickard "remain[s] at least nominally undisturbed"). Congress may not, however, "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." Morrison , 529 U.S. at 617, 120 S.Ct. 1740. In other words, the government may rely on the aggregation concept in criminalizing conduct of an economic nature, but must justify a prosecution of non-economic conduct on the basis of the charged conduct's particularized impact on interstate commerce.
The Constitution also empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution ... all ... Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18. "[T]he Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's "beneficial exercise.' " United States v. Comstock , 560 U.S. 126, 133-34, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (quoting McCullough v. Maryland , 17 U.S. (4 Wheat.) 316, 413, 418, 4 L.Ed. 579 (1819) ). The Supreme Court has rejected the "argument that the Necessary and Proper Clause permits no more than a single step between an enumerated power and an Act of Congress," id. at 148, 130 S.Ct. 1949, and "long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be 'absolutely necessary' to the exercise of an enumerated power." Jinks v. Richland Cty. , 538 U.S. 456, 462, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003) (quoting McCullough , 17 U.S. (4 Wheat.) at 414-15 ). Rather, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." Comstock , 560 U.S. at 134, 130 S.Ct. 1949. Thus, "[u]nder the question presented, the relevant inquiry is simply 'whether [ § 844(e) is] reasonably adapted to the attainment of a legitimate end under the commerce power." Id. at 135, 130 S.Ct. 1949 (quoting Gonzales v. Raich , 545 U.S. 1, 37, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (Scalia, J., concurring in judgment) ).
2. Analysis
The federal bomb threat statute imposes criminal liability on
[w]hoever, ... in or affecting interstate ... commerce , willfully makes any threat, or maliciously conveys false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive.
18 U.S.C. § 844(e) (emphasis added).[4] "Congress uses different modifiers to the *146 word 'commerce' in the design and enactment of its statutes." Circuit City Stores, Inc. v. Adams , 532 U.S. 105, 115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). "The phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause." Id. The Supreme Court thus has construed the term "affecting commerce," as used in § 844(e)'s neighbor, 18 U.S.C. § 844(i) -the federal arson statute-to "signal," absent any qualifying language, "Congress' intent to invoke its full authority under the Commerce Clause." Jones v. United States , 529 U.S. 848, 854, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (alteration omitted).[5]
The government's factual proffer in the form of the affidavit supporting the original criminal complaint against the defendant, alleges that "[a]s a result of Pettaway's actions, large areas immediately surrounding the White House were closed to pedestrian traffic; other areas which had been closed briefly to facilitate the President's departure, remained closed as a result of Pettaway's actions, while law enforcement took Pettaway into custody and ensured the safety of the area." U.S.S.S. Aff. ¶ 6. Areas the defendant's conduct affected included "the Renwick Art Gallery, the historic Decatur House Museum, the U.S. Department of the Treasury, the Treasury Annex, the Blair House, and the White House Conference Center," all of which "were closed for approximately 90 minutes." Id. The affidavit also alleges that "White House tours were stopped for approximately 30 minutes," and "[c]onstruction work by two separate private companies, which was then underway in Lafayette Park, was stopped for a *147 period of approximately 90 minutes." Id. Moreover, "[t]he Vice President, who was scheduled to arrive at the White House by motorcade shortly thereafter, was delayed due to the area closures." Id. "These closures and delays," the government asserts, "affected interstate commerce." Id.
The defendant argues that § 844(e), as applied to him, exceeds the scope of Congress's authority under the Commerce Clause because Congress may regulate, in addition to channels and instrumentalities of interstate commerce, only "activities that are 'economic in nature ,' " and a bomb threat is not economic in nature. Def.'s Reply at 5 (quoting Morrison , 529 U.S. at 617, 120 S.Ct. 1740 ). The defendant misreads Morrison , however, which does not sweep as broadly as his argument asserts. Morrison did not bar regulation of noneconomic conduct that affects interstate commerce in individual instances-only regulation of noneconomic conduct that affects commerce merely in the aggregate. See 529 U.S. at 613, 120 S.Ct. 1740 ("While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases ....), id. at 615-17, 120 S.Ct. 1740 ("[P]etitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on" [interstate commerce].... [and may] be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant.... We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.") (emphasis added). Here, the government's theory does not rest on the concept that similar bomb threats affect interstate commerce in the aggregate. Instead, the government contends that the defendant's conduct itself affected interstate commerce. See U.S.S.S. Aff. ¶ 6.
Language in Morrison may be cherry-picked and taken out of context to suggest that Congress may never regulate noneconomic activity that affects interstate commerce, see, e.g. , Def.'s Suppl. Reply at 2, ECF No. 18 (quoting Morrison , 529 U.S. at 613, 120 S.Ct. 1740 ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."), but context makes clear that the Supreme Court's holding was limited to barring Congress from regulating noneconomic activity that affects interstate commerce only in the aggregate, see Morrison, at 613, 615-617, 120 S.Ct. 1740 (referring repeatedly to the aggregation concept). See also Seven-Sky v. Holder , 661 F.3d 1, 16 (D.C. Cir. 2011), abrogated on other grounds by Nat'l Fed'n of Indep. Bus. , 567 U.S. 519, 132 S.Ct. 2566, 183 L.Ed.2d 450 ("Today, the only recognized limitations [on Congress's Commerce Clause authority] are that (1) Congress may not regulate non-economic behavior based solely on an attenuated link to interstate commerce, and (2) Congress may not regulate intrastate economic behavior if its aggregate impact on interstate commerce is negligible."); Rancho Viejo, LLC v. Norton , 323 F.3d 1062, 1080 (D.C. Cir. 2003) (Ginsburg, C.J., concurring) ("[O]ur rationale for concluding [that the conduct in question] affects interstate commerce does indeed have a logical stopping point, though it goes unremarked in the opinion of the court. Our rationale is that ... [the conduct] can be regulated if-but only if-the [conduct] itself substantially affects interstate commerce." (emphasis added) ). Morrison 's distinction between economic and noneconomic activity thus is inapposite.[6]
*148 Indeed, the D.C. Circuit has resolved any doubts about the constitutionality § 844(e)'s application to the defendant's conduct by squarely holding that a criminal statute containing an express jurisdictional element requiring particularized "evidence" of conduct's "concrete and specific effect" on interstate commerce falls within Congress's Commerce power, and thus avoids the constitutional infirmity that plagued the statute at issue in Lopez . See Harrington , 108 F.3d at 1466-67.[7] Though neither the government nor the defendant cited Harrington in their briefing, Harrington remains good law, even after Morrison . See, e.g., United States v. McKeever , 824 F.3d 1113, 1127 (D.C. Cir. 2016) (citing Harrington with approval); United States v. Wilson , 240 F.3d 39, 43 (D.C. Cir. 2001) ("[W]e have already held ... that to support a statutory jurisdictional link for a specific criminal act it is enough that the evidence show that the act had 'an "explicit" and "concrete" effect on interstate commerce, rather than a "substantial" one.' " (citing Harrington , 108 F.3d at 1465 ) ). In a supplemental reply filed after the motions hearing, the defendant belatedly contends that Harrington is inapposite "because that case involved criminal conduct that was economic in nature," and Morrison bars regulation under the Commerce Clause of noneconomic activity such as the defendant's conduct. Def.'s Suppl. Reply at 3. As explained above, however, Morrison did not bar, as violative of the Commerce Clause, regulation of any noneconomic activity, but only regulation of noneconomic activity that has no particularized impact on interstate commerce. Harrington thus controls. The economic/noneconomic conduct distinction that the defendant insists renders Harrington inapposite simply is neither found in that decision nor mandated by Morrison .
The defendant further asserts that to accept the government's theory of the case-that his conduct affected interstate commerce because his "threat caused the area surrounding Lafayette Square to temporarily close, which stopped some businesses from operating for 90 minutes"-would "pil[e] 'inference upon inference,' [ ] stripp[ing] the Commerce Clause of any meaningful limit" and "completely obliterat[ing] the distinction between national and local police power." Def.'s Reply at 8-9 (quoting Lopez , 514 U.S. at 567, 115 S.Ct. 1624 ). For example, the defendant asserts, Congress could criminalize a purely "local bar fight" that causes a bar operating in interstate commerce to temporarily suspend service. Id. at 9. This argument begs the question, however, of when conduct is "purely local." For the reasons explained above, a bar fight that concretely impacts interstate commerce is not purely "local," but has a nexus to national affairs sufficiently strong to fall within Congress's regulatory powers. Here, allegations that the defendant's conduct caused federal buildings and businesses engaged in interstate commerce to close for a non-trivial period of time, affected White House operations, and impacted the Vice President's travel, U.S.S.G. Aff. ¶ 6, if accepted beyond a reasonable doubt as true, likewise suffice to show that the defendant's conduct had a "concrete and specific effect" on interstate commerce without improperly piling inference on inference, Harrington , 108 F.3d at 1466. Cf.
*149 Sabri v. United States , 541 U.S. 600, 608, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) ("No piling is needed here to show that Congress was within its prerogative to protect spending objects from the menace of local administrators on the take."); Lopez , 514 U.S. at 557, 115 S.Ct. 1624 (observing "that the power to regulate commerce, though ... limit[ed]," is "broad indeed" (internal quotation marks omitted) ). Accepting the government's theory thus would not impermissibly erode the distinction between national and state authority.[8]
Indeed, the Supreme Court upheld, under the Necessary and Proper Clause, "[a] federal civil-commitment statute authoriz[ing] the Department of Justice to detain a mentally ill, sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released" on the theory that Congress may (1) "criminalize conduct" as a means to effectuate an enumerated power, (2) erect prisons and "imprison individuals who engage in [prohibited] conduct," (3) "enact laws governing prisons and prisoners" so as "to ensure that system's safe and responsible administration," and then (4) "protect nearby (and other) communities from the danger federal prisoners may pose" by keeping "mentally ill and sexually dangerous persons ... in federal custody, even if doing so detains them beyond the termination of their criminal sentence." Comstock , 560 U.S. at 136-37, 142, 130 S.Ct. 1949. The Court held that such reasoning did not improperly " 'pile inference upon inference' in order to sustain [the statute] under Article I," and rejected the argument that "when legislating pursuant to the Necessary and Proper Clause, Congress' authority can be no more than one step removed from a specifically enumerated power." Id. at 146, 130 S.Ct. 1949 (quoting Lopez , 514 U.S. at 567, 115 S.Ct. 1624 ). As Justice Kennedy aptly stated, "[w]hen the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." Id. at 150, 130 S.Ct. 1949 (Kennedy, J., concurring in the judgment). If the logical chain connecting the civil commitment statute at issue in Comstock to an enumerated power was strong enough to withstand challenge, the chain supporting the defendant's indictment under § 844(e) surely passes muster as well.
For these reasons, based on the government's factual proffer, the indictment does not fall outside the scope of congressional power, and the government is entitled to the opportunity at trial to produce evidence sufficient to establish the requisite jurisdictional element in the statute.[9]
*150 B. Defendant's First Amendment and Mens Rea Challenges
The defendant next contends that the First Amendment protects, and § 844(e) does not cover, the defendant's conduct, an issue that turns on the defendant's state of mind in acting. Again, triable issues of fact exist as to this issue, making dismissal on these grounds inappropriate at this pre-trial stage.
1. Section 844(e)'s Scope and True Threats Under the First Amendment
The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. "The protections afforded by the First Amendment, however, are not absolute, and ... the government may regulate certain categories of expression consistent with the Constitution." Virginia v. Black , 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). For example, "the First Amendment [ ] permits a State to ban a 'true threat,' " a category that "encompass[es] those statements where the speakers means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id. at 359, 123 S.Ct. 1536. "The speaker need not actually intend to carry out the threat" for a threat to be true; a speaker need merely "direct[ ] a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id. at 360, 123 S.Ct. 1536. A "true threat" is "a serious threat as distinguished from words as mere political argument, idle talk or jest." United States v. Spruill , 118 F.3d 221, 228 (4th Cir. 1997) (quoting United States v. Leaverton , 835 F.2d 254, 256 (10th Cir. 1987) ). Whether speech constitutes a "true threat" outside the scope of First Amendment protection thus turns on the speaker's mental state-whether the speaker acted with intent to commit unlawful violence or to place a victim in fear of the same. See Black , 538 U.S. at 359-60, 123 S.Ct. 1536 ; see also Elonis v. United States , --- U.S. ----, 135 S.Ct. 2001, 2011-12, 192 L.Ed.2d 1 (2015) ("Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state.").
Section 844(e)'s mens rea requirement of proof that a defendant either "willfully ma[de] a[ ] threat, or maliciously convey[ed] false information knowing the same to be false," 18 U.S.C. § 844(e) (emphasis added), "reflects the basic principle that 'wrongdoing must be conscious to be criminal,' " and accords with "the 'general rule' [ ] that a guilty mind is a necessary element in the indictment and proof of every crime." Elonis , 135 S.Ct. at 2009 (quoting Morissette v. United States , 342 U.S. 246, 252, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ; United States v. Balint , 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922) ). Although the D.C. Circuit has not had an opportunity to opine on this issue, several other Circuits have held that *151 § 844(e)'s proscription is coextensive with the First Amendment's "true threat" exception. See, e.g., United States v. Viefhaus , 168 F.3d 392, 395-96 (10th Cir. 1999) (construing § 844(e) to require proof of a true threat); Spruill , 118 F.3d at 228 ("[ Section] 844(e) proscribes only 'true' threats").[10]
2. Analysis
The defendant argues that the government identifies insufficient evidence to establish beyond a reasonable doubt that he acted with the requisite mental state to either (1) establish culpability under § 844(e) or (2) place his conduct outside the First Amendment's protection. Def.'s Mot. at 10-13. The government acknowledges that the defendant appeared to "experienc[e] ... auditory hallucinations," claimed to have come to the White House for safety, and "indicated that he did not wish to harm the president" during a law enforcement interview conducted shortly after the charged conduct occurred. See U.S.S.S. Aff. ¶ 7.[11] The government proffers, however, that the defendant approached a Secret Service officer outside the White House, claimed to be carrying explosives on his person, claimed that his cell phone was a trigger, and reiterated several times his claim to be bearing explosives. Id. ¶ 5. The government also proffers that a cell phone was in fact found on the ground nearby. Id. The context and content of the defendant's statements-uttered outside the White House to Secret Service personnel, claiming to possess both explosives and the means to detonate them-create triable issues of fact as to whether the defendant acted both (1) willfully, or else maliciously and knowingly, as § 844(e) requires for criminal liability to attach to his conduct, and (2) with intent to commit or place victims in fear of violence. To dismiss the defendant's indictment before the government can "present its evidence at trial," Yakou , 428 F.3d at 247, thus would be inappropriate.
IV. CONCLUSION
The Commerce Clause, First Amendment and the statutory mens rea requirement limit the government's ability to impose criminal liability. At trial, the government will need to prove beyond a reasonable doubt both that the defendant's conduct affected interstate commerce and that the defendant acted with intent to commit or instill fear of violence to secure a conviction. Contrary to the defendant's arguments, the government is entitled to present evidence on both of these points. For this reason, the defendant's motion to dismiss is denied. An *152 appropriate Order accompanies this Memorandum Opinion.
ORDER
Upon consideration of defendant Erwin Pernell Pettaway's Motion to Dismiss Indictment, ECF No. 14, the related legal memoranda in support of and opposition to this motion, the arguments presented at the motions hearing, and the entire record herein, for the reasons set out in the accompanying Memorandum Opinion, it is hereby
ORDERED that the defendant's Motion to Dismiss Indictment is DENIED.
SO ORDERED.
This is a final and appealable order .

Citations to the February 23, 2018 hearing transcript cite to a rough draft of the transcript, for which page numbers are unavailable. A final transcript is forthcoming and will be made available on this case's docket.

Prior to 2014, Rule 12(b) provided: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue ." Fed. R. Crim. P. 12(b) (2002) (amended 2014) (emphasis added). "The more modern phrase 'trial on the merits' [wa]s substituted for the more archaic phrase 'trial of the general issue' " in 2014 as part of a stylistic revision, and "[n]o change in meaning [wa]s intended." Fed. R. Crim. P. 12(b)(1) advisory committee's notes to 2014 amendment. Yakou , decided prior to the 2014 revision, observed that Rule 12(b)'s " 'general issue' [term] has been defined as 'evidence relevant to the question of guilt or innocence.' " 428 F.3d at 246 (quoting Ayarza-Garcia , 819 F.2d at 1048 ).

Several sister Circuits have reached similar conclusions. See, e.g. , United States v. Clausen , 328 F.3d 708, 710 (3d Cir. 2003) ("[A] de minimis effect on commerce is sufficient [where a] jurisdictional element ensures that the Act is only applied to crimes whose impact crosses state lines. A substantial effect would only be required if the crimes proscribed were purely intrastate."); United States v. Farrish , 122 F.3d 146, 149 (2d Cir. 1997) (holding that the government need only show a de minimis impact on interstate commerce when charging conduct under a statute containing a jurisdictional element that "by its terms, [ ] applies only to those acts which themselves can be shown to affect interstate commerce."); United States v. Castleberry , 116 F.3d 1384, 1387 (11th Cir. 1997) ("Because the [statute] contains this jurisdictional element, ... the Government only needs to establish a minimal effect on interstate commerce to support a violation."); United States v. Atcheson , 94 F.3d 1237, 1242 (9th Cir. 1996) (holding that a statute containing a jurisdictional element "directly aim[ed] at economic activities which 'in any way or degree affects [interstate] commerce' ... is concerned solely with inter state" activities, and so applies even to activity that does not "substantially affect[ ]" interstate commerce) (quoting 18 U.S.C. § 1951(a) ).

Section 844(e) also imposes criminal liability on whoever engages in the prohibited conduct "through the use of the mail, telephone, telegraph, or other instrument of interstate or foreign commerce." 18 U.S.C. § 844(e). The defendant initially argued that his conduct did not satisfy § 844(e)'s jurisdictional element because he did not use a phone to communicate a threat, see Def.'s Mot. at 4-10, but after the government clarified that the charge is not that "Pettaway used his cell phone to communicate his threat," but only that his "bomb threat/hoax affected interstate commerce," Gov't's Opp'n at 9-10, the defendant abandoned this argument, see Def.'s Reply at 4. Nonetheless, the defendant observes that Eleventh Circuit pattern jury instructions require that "the [d]efendant used, or caused to be used, an instrument of commerce, such as [the mail] [a telephone] to communicate the threat" to find a defendant guilty of a § 844(e) offense. Def.'s Reply at 1 (quoting Pattern Crim. Jury Instr. 11th Cir. OI 027 (2016) ). As the defendant acknowledges, however, these pattern jury instructions "ignore [§ 844(e)'s] jurisdictional language that someone can be convicted making bomb threats that "affect interstate commerce." Id. at 9. In any event, an example of a pattern jury instructions from another jurisdiction simply is not helpful to the defendant's position. See United States v. Grover , 485 F.2d 1039, 1042 n.5 (D.C. Cir. 1973) (observing that jury instructions are mere "suggestions ... and are of course not binding."); U.S. SEC v. Quan , 817 F.3d 583, 593 (8th Cir. 2016) ("Of course, a model jury instruction is not controlling law and can be incorrect."); United States v. Porter , 542 F.3d 1088, 1097 n.4 (5th Cir. 2008) ("Pattern jury instructions are not law.").

Jones construed the federal arson statute-criminalizing "maliciously damage[ing] or destroy[ing], or attempt[ing] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used ... in any activity affecting interstate or foreign commerce," 18 U.S.C. § 844(i) - not to reach arson of "property occupied and used by its owner not for any commercial venture, but as a private residence." 529 U.S. at 854, 120 S.Ct. 1904. The federal arson statute is, by its plain terms, of more limited reach than the federal bomb threat statute. Specifically, the federal arson statute's jurisdictional element focuses not on "activity affecting interstate or foreign commerce," but more specifically, on property that is "used " in such activity. 18 U.S.C. § 844(i) (emphasis added). By contrast, the federal bomb threat statute's jurisdictional element does not use the qualifying term "used," id. § 844(e) -a term on which Jones 's conclusion that § 844(i) does not reach the "arson of an owner-occupied private residence" rested heavily. 529 U.S. at 854, 120 S.Ct. 1904. As relevant here, Jones recognized that the federal arson statute would reach the outer limits of Congress's Commerce Clause power but for the statute's inclusion of the term "used." Id.

The defendant also argues that § 844(e) cannot be sustained as "an essential part of a larger regulation of economic activity." Def.'s Reply at 7 (quoting Raich , 545 U.S. at 24, 125 S.Ct. 2195 ). The government does not rely on such a theory, however.

For this reason, Pettaway's assertion that § 844(e)'s jurisdictional element does not resolve the statute's constitutionality, see Def.'s Reply at 5-6, is incorrect under binding D.C. Circuit precedent.

A different hypothetical illustrates the folly of the defendant's approach. Suppose a person makes a bomb threat at the New York Stock Exchange, temporarily suspending all trading activity and sending global financial markets plummeting. The government could not indict that person under the defendant's approach, as the conduct in question was not itself economic in nature-never mind the conduct's significant impact on interstate commerce. If causing the New York Stock Exchange to temporarily suspend operations creates a sufficient nexus to interstate commerce, why not the Renwick Art Gallery or U.S. Department of the Treasury? To be sure, threatening to bomb the New York Stock Exchange undoubtedly would impact interstate commerce more substantially than threatening to bomb the Renwick Art Gallery, but that is beside the point, as conduct need only have a concrete impact on interstate commerce to fall within Congress's regulatory authority. See Harrington , 108 F.3d at 1467.

In the alternative, although not addressed by the parties, the government would likely have authority to indict the defendant under § 844(e), "[e]ven if there were some doubt about § [844(e) ]'s constitutionality outside the District of Columbia," pursuant to Congress's power "[t]o exercise exclusive legislation in all cases whatsoever, over" the District of Columbia. U.S. Const. art. I, § 8, cl. 17 ; United States v. Mahdi , 598 F.3d 883, 896 (D.C. Cir. 2010) (alterations omitted) (quoting United States v. Carson , 455 F.3d 336, 368 (D.C. Cir. 2006) ) ("It is impossible to see how a statute regulating conduct within the District of Columbia could exceed congressional authority under the Commerce Clause.... Within the District, Congress did not need to rely on its Commerce Clause authority."). Like 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering activity and was upheld by the D.C. Circuit against a Commerce Clause challenge in Madhi and Carson , § 844(e) is not framed as a criminal prohibition specific to the District of Columbia, but rather applies to "[w ]hoever ... willfully makes any threat, or maliciously conveys false information knowing the same to be false"-language that naturally encompasses persons who so act within the District of Columbia. 18 U.S.C. § 844(e) (emphasis added).

As explained below, triable issues of fact exist as to whether the defendant acted with the requisite mens rea under both § 844(e) and the First Amendment, making unnecessary any determination whether these mens rea requirements are coextensive. Section 844(e)'s phrase "willfully makes any threat" plausibly could be construed to refer only to true threats of the sort the First Amendment does not protect, but might also be read to reach more broadly. Likewise, § 844(e)'s phrase "maliciously conveys false information knowing the same to be false" might be construed to refer only to communications made with the intent of "placing [a] victim in fear of bodily harm or death," Black , 538 U.S. at 360, 123 S.Ct. 1536, but also might be read more broadly. These questions, though purely legal, are best resolved with the benefit of a full factual record to clarify the circumstances, if any, under which a statement that is culpable under § 844(e), nonetheless may not constitute a true threat for First Amendment purposes.

The defendant also asserts that he had been "treated and released from the George Washington University Hospital for mental health and substance abuse issues" immediately prior to the time the charged conduct occurred and was "still wearing his hospital bracelet," Def.'s Mot. at 1, but identifies no evidentiary support for these claims.